**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EILEEN LYNCH, ERIN RUBIO, and )
ANEESA SALEH, )
)
    Plaintiffs, )     Case No. 2021-cv-00366
)
        v. )     Judge Sara L. Ellis
)
BOARD OF TRUSTEES OF )
COMMUNITY COLLEGE DISTRICT )     Magistrate Judge Sheila M. Finnegan
NO. 508 d/b/a CITY COLLEGES OF )
CHICAGO, )
)
    Defendant. )
)

## JOINT MOTION TO RESOLVE DISCOVERY DISPUTES

    Plaintiffs, through their undersigned counsel, and Defendant, through its undersigned counsel, and pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 37, jointly move this Honorable Court for an order resolving discovery disputes regarding the interrogatory answers and production of documents outlined herein, and in support of which state the following.

### Factual Background Relevant to the Discovery Disputes

    1.    This lawsuit was brought by three Plaintiffs alleging multiple violations of law in their 10 count Amended Complaint. The Complaint alleges that each Plaintiff engaged in multiple instances of protected activity of various natures spanning complaints of gender discrimination, pregnancy discrimination, sexual harassment, and involving disclosing fraudulent and unlawful misconduct taking place within Richard J. Daley College (where they worked), which misconduct was ultimately the subject of a finding by City College's Office of Inspector General ("OIG"). Within days of the OIG making a finding of misconduct that was based on their complaints, Plaintiffs' were terminated and their terminations were ratified by the

Board.

2.     Much of the misconduct Plaintiffs reported centers around one colleague, Roberto Torres, who was hired as Dean of Instruction at Daley College in February 2018. Plaintiff contends that  Torres was hired by the college notwithstanding a criminal history that included felony theft charges for stealing more than $20,000 from his prior employer, which arrest and later admission were reported in the media. Defendant contends that his criminal history been expunged and could not be considered by CCC as a basis for not hiring Torres.

3.     After he was hired into Daley College, Plaintiffs allege that Mr. Torres continued to commit acts of fraud and other misconduct that harmed the school, deprived the school of financial resources, and jeopardized the safety and well-being of its students. In 2019, Torres made up a story about being engaged to be married to a male physician who he claimed had committed suicide. Torres prominently displayed a photograph of his purportedly deceased fiancée in his office and widely discussed his grief. During this time, he took paid bereavement leave from Daley College. Plaintiffs also allege that, during this time, he offered to speak with a student who was experiencing suicidal thoughts, explaining that he believed his recent experience with suicide could be of assistance.

4.     It turns out, however, that Torres had no such experience with suicide and had no fiancé. He had manufactured the entire story. Plaintiffs contend that Plaintiff Rubio discovered his fraud in the fall of 2019 when she was reviewing a student athlete's medical authorization form and discovered that the form itself was fraudulent and was purported to have been completed by the physician who Torres had claimed was his deceased fiancé. Plaintiffs further allege that Plaintiff Rubio discovered the physician was alive and well, married to a woman, was never engaged to Torres, and did not complete the medical form for the student. Plaintiffs claim that,

upon making this discovery, Plaintiffs Saleh, Lynch, and Rubio together made a formal complaint to the OIG about Torres, the fraudulent medical form, and their concerns regarding Torres' conduct throughout his employment, which also extended to Title IX violations, improper contact with students, and bypassing Defendant's payment and registration systems to allow students to improperly late register for classes and to not pay tuition fees. CCC agrees its OIG received a complaint about Torres, but that it came from an anonymous source, discovered much later to be Plaintiff Saleh. Plaintiffs contend that there is evidence that it was openly known and discussed that it was Plaintiffs who had reported Torres to the OIG.

5. During the OIG investigation, Torres admitted to having made up the story about a deceased fiancée and the OIG made a finding against Torres for having falsified attendance records, fraudulently obtaining employment benefits, and for conduct unbecoming of a public employee. The OIG also made a finding against the student who had submitted a fraudulent medical form. Plaintiffs contend these findings were issued to the Board of Trustees President, Walter Massey, the Chancellor, Juan Salgado, and to CCC's legal counsel, Karla Gowen, on January 9, 2020. They were also shared with Daley College President, Janine Janosky. CCC contends that the OIG issued its report on January 9, 2020, and delivered it to Daley College President, Janine Janosky, the Chancellor, Juan Salgado, CCC's legal counsel, Karla Gowen, and Board of Trustees President, Walter Massey. Defendant contends that, after receiving the report, President Janosky requested additional time to determine the proper disciplinary action, which the Chancellor granted, and further contends that on February 10, 2020, President Janosky made the decision to terminate Torres.

6. Eleven days after the OIG report on Torres, on January 22, 2020, Defendant notified Plaintiffs that they were being terminated from their employment. Plaintiff's terminations

were then listed on a personnel report and presented to the Committee on Academic Affairs and Student Services on February 13, 2020, and thereafter sent to the Board for consideration at its regular meeting the same day. Roberto Torres was not listed for termination on that report, but Defendant contends he was terminated that same day.

7. Two days prior, on February 11, 2020, Plaintiffs' counsel had sent a letter to Defendant asserting the terminations were retaliation for their reporting and requesting the letter be presented to the Board before acting on the terminations. The Board discussed the matter in a closed session of the meeting, and then ratified the Plaintiffs' terminations on February 13, 2020.

8. Plaintiffs contend this is not a work performance case, as Defendant had previously conceded the terminations were not connected with any assertion of poor performance answering Plaintiffs' interrogatories to say "Defendant does not contend [Plaintiff] was terminated because of poor performance." Defendant contends that Plaintiffs' positions of Dean of Student Services, and Associate Deans of Student Services, were eliminated because President Janosky decided to restructure the department, changing it from the Department of Student Services to become the Department of Student Development Defendant also contends in this motion that President Janosky's decision to reorganize the Department of Student Services was, in part, due to the Department's dysfunction under Plaintiffs' leadership and their lack of responsiveness to the President.

9. Plaintiffs claim they were not offered the opportunity to remain in their Dean and Associate Deans positions in the allegedly restructured department, they were not encouraged to apply for these positions, and they were not offered interviews for these roles. Defendant concedes it did not encourage Plaintiffs to apply for the positions, but that it posted the job openings and contends that its hiring committee considered those applications made by Plaintiffs.

10.    No other positions in the department were eliminated, just the three Plaintiffs. Defendant notes that the position of Dr. Eduardo Garza, a former President of the college then serving as its Vice President of Institutional Effectiveness, was also eliminated on the same day. Plaintiff notes that Dr. Garza had been investigated by the OIG, which made a finding of misconduct against him.  It is undisputed that Dr. Garza was not in the same Department as the Plaintiffs.

**History of Discovery Disputes and Compliance with Local Rule 37.2**

11.    Plaintiffs issued written discovery requests in May 2021 seeking information about their various instances of protected activity, Defendants' awareness of the same, the decision to terminate their employment, and seeking evidence of the nature routinely gathered in employment cases, *i.e.,* evidence regarding comparators, patterns, and pretext. *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020); *Coleman v. Donahoe*, 667 F.3d 835, 857-860 (7th Cir. 2012).

12.    As the Plaintiffs worked for a government entity, the City Colleges of Chicago ("CCC"), which involves multiple layers of bureaucracy, Plaintiffs' multiple instances of protected activity were directed to various internal and external departments at both the campus level and district wide; including, an EEO office, a Title IX office, a Human Resources Department, a Labor and Employee Relations Department, and the OIG. Plaintiffs contend that for this reason, the discovery in this matter is necessarily more involved than a single plaintiff case with one type of claim against a private employer with only one Human Resources department.

13.    Plaintiffs issued less than 25 interrogatories per Plaintiff and less than 35 document requests per Plaintiff.  The Plaintiffs' written discovery requests totaled 159 separately numbered requests.

14.   The parties both answered each other's written discovery requests in August 2021 and, within weeks of that began engaging in extensive discussions, meetings, and written communications regarding disputes over the sufficiency of the answers and production, meeting in person and telephonically for numerous hours over the next few months to attempt to resolve those disputes before bringing them to the Court.

15.   During these meetings, Defendant's counsel agreed to certain compromises in principal, but stated they needed to obtain approval for the compromises from their client.

16.   Having no confirmation regarding the numerous agreements in principle, Plaintiffs' brought a Motion for Referral to the Magistrate Judge for a Discovery Conference on April 6, 2022. [*See* Dkt. No. 43]

17.   The Court ordered the parties to confer once again and the parties met in person for yet another extensive meet and confer session on April 20, 2022 during which Defendant confirmed Defendant's agreement to many of the compromises reached in prior conferences.

18.   Through the extensive conferring, the parties have significantly narrowed many of the disputes. The parties have agreed that certain remaining disputes may be resolved upon the production of Electronically Stored Information ("ESI") and the emails of individuals with knowledge of this matter.[1] Plaintiff has agreed to review those, once they are produced, to determine if certain information sought would be answered in those e-mails. Should the e-mails not provide the information requested, Plaintiff reserves the right to seek additional relief.

19.   For other remaining disputes, the parties seek the Court's guidance in resolving those as set forth below.

---

[1] Defendants have not yet produced ESI and the parties are currently working toward narrowing search terms for any overbroad searches identified in the recently produced hit reports.

**Discovery Disputes at Issue**

      20.  The specific discovery disputes at issue are as follows:

**<u>Plaintiffs' Protected Activity and Defendant's Awareness of Same</u>:**

      A.    <u>*Lynch Interrogatory No. 16 (regarding awareness of OIG complaints)*</u>:

          i.   Interrogatory 16:  Identify all individuals made aware of any complaints made to the Office of Inspector General in or around October of 2019 relating to Richard J. Daley College, and for each such individual, state his or her name, job title, dates of employment, and when and how he or she became aware of any such complaints or reports.

          ii.   Response:  CCC objects that this Interrogatory is overbroad, unduly burdensome and disproportionate to the needs of the case to the extent it requests dates of employment of the identified individuals or a detailed account of how each identified individual became aware of the any such complaints. CCC further objects that this Interrogatory is irrelevant, overbroad, and disproportionate to the extent it seeks information regarding any complaints made to the Office of the Inspector General ("OIG") by anyone other than Plaintiffs. Further, this Interrogatory seeks information irrelevant to Lynch's claims since, to the best of CCC's knowledge, she never reported any wrongdoing of any kind to the OIG regarding CCC

      Subject to and without waiving its General or Specific Objections, CCC states that, to the best of its knowledge, the only OIG complaint any Plaintiff made against CCC was Plaintiff Aneesa Saleh's October 23, 2019 complaint alleging that Daley College's Dean of Instruction, Roberto Torres, may have made a misrepresentation concerning his fiancé's purported suicide.  To the best of CCC's knowledge, Saleh and Torres were the only CCC employees aware of Saleh's complaint until the time this lawsuit was filed.

          iii.  **Plaintiffs' Position**:

      Defendant's response improperly narrowed the interrogatory to only those complaints to the OIG made by Plaintiffs and only if the individuals with awareness conceded they knew Plaintiffs had made the complaints. While Plaintiffs agreed to limit the interrogatory to only the OIG complaints generated by them (relating to Roberto Torres and Treveon Simmons, the student who falsified the medical form)[2], Defendants still did not agree to identify all individuals who were aware of those two discrete complaints, both of which are at the heart of this matter.

---

[2] The OIG complaint was made against Torres, but the OIG findings were made in two separate reports.

To address Defendant's asserted concern that it would have to interview thousands of employees of CCC, Plaintiff suggested that Defendant interview only those individuals identified by either party in Rule 26(a)(1) Disclosures. Plaintiffs even eliminated certain names from their disclosures that they felt Defendant would not have to interview. Defendant has refused this offer of compromise and is only willing to ask those individuals listed in the OIG investigative file. The OIG file, however, is very limited and reveals how the limitation is designed to omit important individuals with relevant knowledge. The file does not include all individuals who were made aware of the OIG complaint, but only those individuals who were interviewed by the OIG, most of whom are not even employees of Defendant.[3] Plaintiffs, in their own discovery responses, have identified other individuals who were aware of the OIG complaint and who remarked to them that Torres was openly discussing how he knew it was the "Daley bitches" who made the complaint. Plaintiffs also revealed in their written responses that the decision maker in this matter, President Janosky, had conceded to them that she was aware of the OIG complaint and further evidence that she and the Vice-President of the College were aware that the complaint was made by Plaintiffs. Because President Janosky was not formally interviewed by the OIG, Defendant's proposal would fail to even reveal her, the decision maker, as an individual with awareness of the complaint. *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458-59 (7th Cir. 1994)(plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression).

The issue of awareness of protected activity is central to any retaliation case. *Dey,* 28 F.3d at 1458-59; *Riley-El v. Godinez*, 2020 U.S. Dist. LEXIS 30810, at *20-22 (N.D. Ill. Feb. 24, 2020)(to show causation for purposes of a retaliation claim, a plaintiff must raise an inference that the person responsible for the adverse action was aware of the protected activity in the first place);

---

[3] The individuals include, *e.g.,* Dr. Smith and his staff, and a student and his mother. Of the limited number of employees, one is one of the Plaintiffs and the other is Torres himself (the subject of the complaint).

*Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 134 (1981). While certain individuals may deny that they knew it was the Plaintiffs who made the complaint, those denials are disputed and Plaintiffs are entitled to gather evidence of awareness of the complaint to allow the jury to make inferences on that evidence. For example, given the large number of individuals who were aware Plaintiffs had reported Torres to the OIG, given that Torres was openly discussing it, and given President Janosky's conversation with Plaintiffs, the jury can reasonably infer that she was aware that it was, in fact, Plaintiffs who made the complaint. Plaintiffs are entitled to gather additional information from Defendant in a sworn interrogatory answer, which also serves as an admission, regarding all individuals with knowledge of the complaint in order to further determine how openly it was known and how openly it was discussed that it was Plaintiffs who had reported Torres to the OIG. Defendant's proposed limitation does not satisfy its duties of proper inquiry. *Bell v. Woodward Governor Co.*, 2005 U.S. Dist. LEXIS 4451, at *6 (N.D. Ill. Feb. 7, 2005)(under Rule 33(b), interrogatories must be answered fully and include all information within the party's control or known by the party's agents); *Weddington v. Consolidated Rail Corp.*, 101 F.R.D. 71, 74 (N.D. Ind. 1984)(corporate entities have a duty to discover all information available to it through its officers, employees, and others); *Selee Corp. v. McDanel Advanced Ceramic Technologies, LLC*, 2016 U.S. Dist. LEXIS 117319, at *8-9 (W.D.N.C. Aug. 31, 2016)("The Federal Rules of Civil Procedure impose a duty upon companies responding to discovery to 'conduct a reasonable investigation, make reasonable inquiries of its employees, and fully respond' to interrogatories and document requests.")(internal citations omitted).

       iv.   **Defendant's Position**:

      Defendant's response did not improperly narrow the interrogatory. As originally propounded, the interrogatory would have required Defendant to question thousands of employees

across the District to determine all employees that knew of OIG complaints—relevant to the allegations in this case or not—made in or around October 2019. Defendant's response properly addressed Plaintiffs' core concern, which was whether the decision makers at Daley College had knowledge of Plaintiffs' alleged protected activity.

In an effort to resolve the discovery dispute, Defendant agreed to provide Plaintiffs with the OIG file of the Torres investigation, which provides Plaintiffs with notice of who OIG interviewed regarding the investigation and therefore, who presumably might have awareness of the complaint Plaintiff Saleh made to the OIG. Plaintiffs contend the OIG Torres file does not name enough CCC employees and they propose requiring Defendant to inquire of all individuals identified by either party in Rule 26(a)(1) Disclosures. Although Defendant's disclosure names nine individuals, Plaintiffs' disclosure names about 75 individuals. This number drops to 53 individuals once the parties remove those the Plaintiffs agreed to omit.

Plaintiffs' compromise does not sufficiently reduce the burden imposed by the interrogatory. Plaintiffs' compromise would have Defendant interview 53 people across the entire District, most of whom have no say in employment decisions at Daley College and—other than President Janosky and her Vice-President, Anne Panomitros—were not directly involved in the decision leading to Plaintiffs' terminations. More than half of the employees identified by Plaintiffs do not even work at Daley College. Furthermore, 12 of the employee identified for questioning by Plaintiffs are not management personnel of Daley College. Indeed, Plaintiffs' counsel has repeatedly claimed she may freely interview these employees without involving CCC's counsel.

Plaintiffs' interrogatory and proffered compromise are similar to the fishing exhibitions upon which the courts frowned in *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 885 (7th Cir. 2005),

and in *Williams v. Merle Pharm., Inc.,* 15-CV-1262, 2016 WL 3620706, at *5 (C.D. Ill. June 29, 2016). In *Williams*, the plaintiff sued the defendant for retaliatory discharge under the Illinois Whistle Blower Act and other claims. *See id*. at *1. The plaintiff sought to depose the owner and five employees of the defendant based on a belief that they knew of the plaintiff's whistleblowing activities. *Id*. at *4. The court, however, limited the plaintiff to only one deposition of the owner because the case actually turned on his knowledge of the plaintiff's whistleblowing activities. *Id*. at *5. The plaintiff's proffered reason for taking the deposition of the other employees was that she intended "to explore the credibility and motivation of [the defendant] and other employees who may deny any knowledge of [the plaintiff's] protected activity." *Id*. The court found this was an indication that the plaintiff anticipated several people she intended to depose would deny the defendant had knowledge of the plaintiff's protected activity. *Id*. As a result, the court found that the plaintiff was seeking a smoking gun based on mere speculation and found the plaintiff's discovery plan improper. *See id*.

Plaintiffs here are engaged in a similar discovery plan. Plaintiffs anticipate that President Janosky will say that she did not have knowledge of Plaintiffs' protected activity, and as a result, they have cast a wide net across the whole District based on the speculation that others may have known of it. In fact, Plaintiffs actually go a step further here than the *Williams* plaintiff and seek to shift the burden to Defendant to perform the leg work of their discovery plan.

Plaintiffs' retaliation case turns on whether President Janosky had knowledge of Plaintiffs' alleged protected activity. Plaintiffs may test President Janosky's response to this request at deposition. However, requesting Defendant to interview over 50 employees across the entire District for knowledge of OIG investigations when those employees were not involved in the decision at issue is disproportionate to the needs of the case. Therefore, this Court should not

compel Defendant to identify all employee named in the parties' Rule 26(a) disclosures with knowledge of Plaintiffs' relevant complaints to the OIG.

**Plaintiffs' Terminations from Employment:**

    B.     *Lynch Interrogatory No. 5 Document Request Nos. 10, 11, 13, and 88 (regarding Plaintiffs' separations from employment, including communications with and among the Board of Trustees and any information or documents shared with the Board):*

    i.     Lynch Interrogatory No. 5: Describe all communications with or among any member of Defendant's Board of Trustees about the decision to restructure Richard J. Daley College's Student Services Department and/or to terminate the employment of any of the Plaintiffs at any time since 2019, identifying all participants in any such communications and when any such communications took place, and state with specificity what documents, if any, were provided to any members of the Board of Trustees in relation to the decisions to restructure Richard J. Daley College's Student Services Department and/or to terminate the employment of any of the Plaintiffs, identifying which documents were shared with which Board of Trustee members, how they were provided (in person, via email, etc.), and when they were provided. Your answer should include identifying when, if at all, the members of the Board of Trustees were provided a copy of correspondence from Megan O'Malley setting forth Plaintiffs' complaints and requests that the Board not ratify Plaintiffs' terminations from employment and describing any communications with or between the Board members regarding the same.

    ii.     Response: CCC objects to this Interrogatory to the extent it seeks documents or information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. CCC objects that this Interrogatory is unduly burdensome and disproportionate to the needs of the case to the extent it seeks an exhaustive list of each and every communication nominally falling within the ambit of the interrogatory.

    iii.     Document Request No. 10: All documents and/or communications (written or electronic) relating to Defendant's response to Plaintiffs attorney's letter dated February 11, 2020, sent to attorney Karla Gowen to be forwarded to all members of the Board of Trustees, and including all documents and communications (written or electronic) between or among Defendant's employees, members of the Board of Trustees, and any officers or agents, and/or with any third party, regarding or relating to the same; and including any documents or communications relating to any investigation, special meetings, or any additional information requested by and/or provided to any member of the Board of Trustees, and any documents or communications reflecting anyone else aware of the February 11, 2020 letter; and any documents or communications relating to any decisions made, or actions taken, by any member of the Board of Trustees, in response to the February 11, 2020 letter and/or otherwise relating in any way to Eileen Lynch, Erin Rubio, Aneesa Saleh, Eduardo Garza, or Roberto Torres.

iv.    Response:  CCC objects to this Request to the extent it calls for the production of documents or information protected from disclosure by the attorney-client privilege, the work product doctrine protection, or any other applicable privilege, protection or immunity. CCC objects that this request is overbroad, unduly burdensome and disproportionate to the needs of the case to the extent it requests "any documents or communications relating to any decisions made, or actions taken, by any member of the Board of Trustees . . . relating in any way to Eileen Lynch, Erin Rubio, Aneesa Saleh, Eduardo Garza, or Roberto Torres," without regard to the claims and defenses in this case.

Subject to and without waiving its General and Specific Objections, CCC will produce non-privileged, non-protected documents discussing or referring to Plaintiffs' attorney's letter dated February 11, 2020 to the extent such documents exist and are identified by a reasonable and proportional search.

v.    Document Request No. 11:  All documents and communications (written or electronic) provided to any member of the Board of Trustees, relating in any way to Eileen Lynch, Erin Rubio, or Aneesa Saleh at any time.

vi.    Response:  CCC objects to this Request to the extent it calls for the production of documents or information protected from disclosure by the attorney-client privilege, the work product doctrine protection, or any other applicable privilege, protection or immunity. CCC objects that this Request is overbroad, unduly burdensome and disproportionate to the needs of the case to the extent it requests documents or communications provided to the Board of Trustees at any time under any circumstances relating in any way to Plaintiffs, without regard to the claims and defenses in this case.

Subject to and without waiving its General or Specific Objections, CCC will produce the February 13, 2020 Board Personnel Report, which references Plaintiffs' separations. CCC also refers Plaintiffs to the following link through which Plaintiffs can access publicly available monthly Board reports:
https://apps.ccc.edu/brpublic/?_ga=2.262586892.1062232116.1628102418-2129654432.1627313590

vii.    Document Request No. 13:  All documents and communications (written or electronic) relating to the February 2020 meeting of the Board of Trustees, as well as any executive session held, including but not limited to any board meeting packets, any minutes, any documents, communications, and/or notes related to the same.

viii.    Response:  CCC objects to this Request to the extent it calls for the production documents or information protected from disclosure by the attorney-client privilege, the work product doctrine protection, or any other applicable privilege, protection or immunity. CCC objects to this Request as overbroad, unduly burdensome and disproportionate to the needs of the case to the extent it seeks "[a]ll documents and communications" relating to the February 2020 Board of Trustees meeting in any way. CCC objects to this Request as unduly burdensome insofar as it purports to require CCC to produce documents that are publicly available (Board meeting minutes, meeting packets, etc.), and therefore equally accessible to Plaintiffs as they are to CCC. CCC objects that this Request is cumulative and duplicative of other Requests contained herein, including Request Nos. 11 and 12.

Subject to and without waiving its General and Specific Objections, CCC will produce any non-privileged, non-protected documents or communications relating to the February 2020 Board of Trustees meeting that specifically mention or directly relate to Plaintiffs to the extent such documents exist and are identified through a reasonable and proportional search.

      ix.   Document Request No. 88:  Any audio and/or visual recordings of any meetings, including meetings of the Board of Trustees, during which Plaintiffs were discussed in any way, and any recordings of any Board of Trustee meetings (including any executive sessions) that were held in January, February, or March of 2020.

      x.   Response:  CCC objects to this Request as overbroad and irrelevant to the claims and defenses in this case since it seeks recordings of Board of Trustee meetings after Plaintiffs separated from CCC and meetings otherwise unrelated to Plaintiffs. CCC further objects to the extent this Request seeks documents protected by the attorney-client privilege and work product doctrine. Subject to and without waiving its General and Specific Objections, CCC refers Plaintiffs to the following link, through which Plaintiffs can access video recordings of open session Board meetings: https://www.youtube.com/playlist?list=PLiz59Eo-YzhJ9LajR9MzEbYrC0dGa1S90

      xi.   **Plaintiffs' Position**:

Plaintiffs' counsel became involved in this case prior to their terminations from employment. When Plaintiffs were notified of their terminations, Plaintiffs' counsel sent a letter to Defendant's Board of Trustees, via a letter to Defendant's in-house counsel asking her to forward the same to the Board, advocating that the Board reject the request to terminate Plaintiffs' employment. The Board is charged with approving those terminations and they do not become effective until the Board has voted their approval. Plaintiffs' counsel's letter explained that Plaintiffs were the whistleblowers who had reported Roberto Torres to the OIG and that the Board should not ratify the terminations as those terminations were retaliatory in nature and they would, thus, be ratifying the retaliation. Importantly, the Board President, Walter Massey, had just weeks earlier, received the OIG report making findings against Torres, concluding that:

> Roberto Torres' lie about the death of his fiancé obliterates his perceived trustworthiness. Roberto Torres' lie eliminates any confidence in his judgment. Roberto Torres' lie casts great doubt as to his ability to lead the faculty, staff and students of Daley College, since it

is hard to imagine that going forward he will be entitled to anyone's respect. [See Exhibit A, Memorandum from Inspector General to Massey, Salgado, Gowen][1]

Now, just weeks after receiving this report, Massey was being asked to ratify the retaliatory terminations of the whistleblowers. This is why Plaintiff's counsel expressly asked Defendant to share her letter with the Board members, to ensure they were fully informed before voting on Plaintiffs' terminations, which terminations were purported to be position eliminations.

Lynch Interrogatory No. 5 expressly asks if the letter was shared with the Board and asks about any communications with the Board that would bear on the decision to terminate Plaintiffs or eliminate their positions pursuant to a claimed restructuring. Defendant has at all times refused to answer whether the letter was given to the Board and Defendant has refused to answer the remaining inquiries regarding the Board's communications relating to Plaintiffs' terminations and the purported restructuring. This is centrally relevant information Defendant can inquire of the approximately dozen Board members. Moreover, the Board members are each issued "ccc.edu" e-mail address which Defendant can itself access at any time.

Defendant's claim of privilege is equally unavailing. First, the fact of whether Defendant shared counsel's letter with the Board is not entitled to any privilege. It is not a communication, let alone one seeking or providing legal advice. Moreover, personnel decisions are not legal decisions and, thus, the communications about the decision to terminate Plaintiffs' employment would not be entitled to the privilege regardless. "[D]ecisions concerning the discipline and termination of employees are business decisions and any legal advice sought or received is incidental to considerations of what is most prudent for the successful operation of the business." *Breuder v. Board of Trustees of Community College District No. 502*, 2019 U.S. Dist. LEXIS

---

[1] Defendant just designated the intended exhibit as confidential so, while the parties meet and confer on this under the Confidentiality Order, a placeholder is being used instead for the public filing.

125300, at *9 (N.D. Ill. July 26, 2019)(internal quotation marks omitted)(citing cases). In *Kodish v. Oak Brook Terrace Fire Protection Dist.*, an attorney attended a closed session meeting of defendants' board where the decision to terminate plaintiff was discussed and the court held that "the mere attendance of an attorney at [the] meeting d[id] not render everything said or done at the meeting privileged." 235 F.R.D. 447, 453-454 (N.D. Ill. 2006)(holding the board's discussions regarding plaintiff's work history and reasons for the decision to terminate him were *not* privileged; only conversations about potential litigation risk would be privileged); see also *Musa-Muaremi v. Florists' Transworld Delivery, Inc*., 270 F.R.D. 312, 316 (N.D. Ill. 2010). Finally, Defendant has provided a privilege log in this matter that would reveal if any privileged communications were held with a Board member and no such communications are listed. [See Exhibit B, Privilege Log] Frankly, it appears that Defendant simply does not want to admit that it never shared counsel's letter with the Board, thereby concealing from the Board important considerations surrounding Plaintiffs' terminations for which it sought cover by way of ratification from the Board. This admission is not a matter of privilege. It is evidence of an improper motive behind asking for Board approval to eliminate Plaintiffs' positions as a pretext for retaliation.

Defendant's responses to the document requests (seeking information provided to the Board regarding Plaintiffs, their terminations, counsel's letter, and all documents or recordings relating to the Board meeting in which Plaintiffs' terminations and Roberto Torres' subsequent termination were discussed) are replete with objections followed by a vague response that certain "non-privileged, non-protected" documents may be produced. However, no documents related to the communications about counsel's letter have been produced and no executive session meeting notes or recordings, during which the Plaintiffs' terminations were discussed, have been produced.

Defendant continues to claim privilege and burden to refuse this information. Whether or not the Board was aware that it was ratifying the terminations of the whistleblowers for the scathing OIG report it had just received is highly relevant information, as is what the Board discussed in relation to the request to vote to approve the elimination of Plaintiffs' positions. This information, and these documents, can reveal motive, pretext, disparate treatment, and also bear directly on a cat's paw theory of liability were Defendant to suggest that the Board's vote lends legitimacy to the terminations. Again, Defendant's claims of privilege are unfounded. Defendant's in-house counsel's routine attendance at Board meetings, and inclusion in executive session, does not cloak those meetings or executive sessions in the privilege. Those sessions were not held for the purpose of seeking or obtaining legal advice. They were held for the purpose of reviewing personnel reports and voting to approve personnel decisions, including the personnel decisions relating to Plaintiffs and, later, relating to Roberto Torres. *Breuder*, 2019 U.S. Dist. LEXIS 125300, at *9; *Kodish,* 235 F.R.D. at 453-454; *Musa-Muaremi,* 270 F.R.D. at 316 ("The privilege does not, however, protect business decision advice, even when that business advice is rendered by an attorney or an attorney is one of those participating in the business decision.").

xii.    **Defendant's Position:**

Plaintiffs have combined five discovery requests to seek access to the Board's records, even though they are privileged.  Plaintiffs already have access to the open meeting of the Board and its Committees. They, however, should not be afforded any additional access to Board records because: (1) the actions of the Board are not relevant to establishing liability against CCC; (2) the records sought from the Board's closed sessions are subject to attorney client privilege; and (3) the records from the Board's closed session are protected from disclosure under privileges provided by the Illinois Open Meetings Act, 5 ILCS 120/1 *et seq*., ("the OMA").

*The Board's Involvement in the Termination of Plaintiffs*

Plaintiffs misapprehend how CCC makes personnel decisions. As explained in the contemporaneously filed Joint Motion to Resolve Discovery Dispute Concerning Plaintiffs' Notice of Deposition for Dr. Massey's Deposition ("Dr. Massey Mot."), the Board has virtually no direct involvement in suspension, demotion, termination, or any other personnel decisions regarding CCC employees. Those decisions are made at the college level, including at Daley College. Rather, the Board only ratifies personnel decisions made at the college. It does so in open session in a single vote approving the personnel report which may have more than 100 personnel actions on it. Unlike promotions, termination decisions are immediately effective when they are made at the college level. If the Board, for some reason, were not to ratify a termination, the terminated employee would be reinstated. (*See* Bd. of Trs. Policies and Procedures for Mgmt. and Gov't. 4.17.1) However, to the to the best of CCC's knowledge its Board has always approved the personnel reports. (Decl. of E. Nichols, Ex. 3 to Dr. Massey Mot., ¶ 5.)

Here, Dr. Janosky, the President of Daley College where Plaintiffs worked, made the decision leading to Plaintiffs' terminations. Upon announcement of the decision on January 22, 2020, College officials collected Plaintiffs' security access cards, deactivated their CCC email accounts, and had Plaintiffs escorted off campus. They also had Plaintiffs removed from the next regular payroll. On January 24, 2020, Plaintiff Lynch filed an unemployment insurance claim. She began collecting unemployment compensation on January 26, 2020, nearly three weeks before the next meeting of the Board. The Board later ratified that decision, along with 46 other personnel decisions, in a single vote on that month's personnel report, well after Dr. Janosky's decision that forms the basis of Plaintiffs' retaliation claims.

As CCC has previously explained to Plaintiffs, "[i]f Dr. Janosky's decisions were made

with retaliatory or discriminatory animus in violation of statute, CCC is liable. The Board's later ratification of the decision does not alter such liability." (CCC's Dec. 6, 2021, Email, Ex. 9 to Dr. Massey Mot.) The Board's vote to ratify the personnel report—something it has done at every board meeting—has no bearing on the outcome of the case. Discovery of Board communications in a closed session is, therefore, irrelevant and disproportional to the needs of the case.

***Access to Information and Documents Protected by Attorney-Client Privilege***

On February 11, 2020, Plaintiffs' counsel sent a letter to CCC's General Counsel directed to CCC's Board threatening legal action and calling Dr. Janosky's decision leading to Plaintiffs' terminations "unlawful retaliation." *See* Feb. 11, 2020, Letter from M. O'Malley to Gowen attached as **Exhibit C**. Plaintiffs now seek information and records from the closed sessions in which the Board discussed her very letter with CCC's General Counsel. Specifically, CCC's Board sought and received legal advice in the February 13, 2020, closed session from its General Counsel about the litigation threats by Plaintiffs' counsel.

Such communication is subject to attorney-client privilege, as well as the attorney work product doctrine. Here, faced with a threat of litigation, the Board turned to its General Counsel for legal advice. This is exactly why the attorney-client privilege exists—"to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Sandholm v. Dixon Pub. Sch. Dist. No. 170, 09 C 50119*, 2010 WL 899032, at *4 (N.D. Ill. Mar. 10, 2010). Further, documents created by the Board in anticipation of the litigation threatened by Plaintiffs' counsel are also subject to the attorney work product doctrine codified in FRCP 26(b)(3)(A) and the opinion shared by its General Counsel by the doctrine codified in FRCP 26(b)(3)(B).

And, contrary to Plaintiffs' assertions, Defendant's interim privilege log provided to Plaintiffs does identify communication between the General Counsel and the Board concerning Plaintiffs' counsel's February 11, 2020, letter. *See* CCC's Privilege Log, line 6, attached as **Exhibit B**. Further, the parties agreed that they will supplement their privilege logs when they provide the supplemental document productions later this month. At that time, CCC will add additional documents, including one setting the agenda for the closed session, including about "future litigation."

### *Information and Documents from Closed Sessions are Protected under the OMA*

Plaintiffs seek documents from the Board's closed sessions, which they inaccurately call "executive sessions." This distinction is important. Under the OMA, the CCC Board may hold a "closed session" when, *inter alia*, litigation has been filed or is likely. Specifically, a closed session may be "held when an action against, affecting, or on behalf of the particular public body has been filed and is pending before a court or administrative tribunal, or when the public body finds that an action is probable or imminent." 5 ILCS 120/2(c)(11). This was a reason for the closed session on February 13, 2020. And, in fact, CCC retained the undersigned counsel just before the closed Board meeting.

Closed sessions are subject to privileges under the OMA and should not be produced to Plaintiffs here. "[T]he policy underlying the [OMA] privilege is similar to that of the federal deliberative process privilege: to promote frank discussion of legal and policy matters." *Sandholm*, 2010 WL 899032, at *2 (N.D. Ill. Mar. 10, 2010). As a matter of public policy, Illinois has determined the frank discussion of legal and policy matters is so important to government bodies that under the OMA, closed session recordings may only be disclosed after the Board reviews the recordings and determines they can be released to the public. *See* 5 ILCS 120/2.06(e). In fact,

verbatim recordings and transcripts from closed sessions are even *prohibited* from disclosure in judicial proceedings, unless the proceeding is brought to enforce the OMA. *See id*.

The OMA privilege for closed sessions is based in state law to which this Court is not bound when a case arises under federal law. However, as the Court recognized in *Tumas v. Bd. of Educ. of Lyons T'ship*, "a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." 2007 WL 2228695 at *7 (N.D. Ill. July 31, 2007). Illinois has clearly articulated its public policy to protect government bodies' frank discussion of legal and policy matters for the decision making process. Allowing Plaintiffs access to records of the closed session would flout this public policy.

And, Plaintiffs cannot demonstrate a "substantial cost" to federal substantive and procedural policy if they did not have access to the closed sessions records. Plaintiffs[3] argue they are entitled to access the closed session because they claim their employment was discussed in it. However, Plaintiffs were only discussed in the closed session because of the February 11, 2020, letter from their counsel to CCC's Board and General Counsel threatening litigation with regard to a decision that had already occurred at the college level. Allowing Plaintiffs access to closed session records under this strategy would severely impact the frank discussion government bodies can have regarding legal matters.

Allowing such access would also set a bad precedent; Plaintiffs whose terminations are awaiting ratification will send letters threatening litigation to government Boards and claim any Board conversation in closed sessions about their letters is subject to disclosure, circumventing an explicit reason for closed sessions. Thus, the Court should deny Plaintiffs' request as a matter of comity to Illinois.

**Information Related to Roberto Torres, Whose Misconduct Gave Rise to Plaintiffs' Whistleblowing**

      C.  *Lynch Interrogatory No. 19 (regarding Torres' criminal history when hired)*:

      i.  Interrogatory: Identify all individuals who became aware of Roberto Torres' termination from Seton Academy and any allegations of misconduct made against him in relation to his employment with Seton Academy, and for each such individual, state his or her name, job title, dates of employment, when and how he or she became aware of any such allegations, the full extent of his or her knowledge or awareness of same, and any action the individual took in response to such awareness or knowledge.

      ii.  Response: In addition to its General Objections, CCC objects that this Interrogatory seeks information irrelevant to any claim or defense in the litigation. The matters relevant to this case concern Plaintiffs' separations from CCC, not the circumstances of other individuals' separations from other entities. CCC further objects that this Interrogatory is unduly burdensome and disproportionate since it requires CCC to investigate numerous potential individuals with responsive knowledge, gather their personnel information, and determine precisely what knowledge each such individual may have. CCC makes no response to this Interrogatory based on these objections.

      iii.  **Plaintiffs' Position**:

Roberto Torres is a central figure in this action whose misconduct gave rise to Plaintiffs' whistleblowing, both internally and to the OIG. Torres had a troubling history of misconduct that was reported on in the news media even before he was hired by Defendant. Specifically, Torres' former employer, Seton Academy, pressed criminal charges against him for theft of more than $20,000, a case which was publicized by the media and can be discovered by a quick Google search, and was known to other CCC employees. Plaintiffs have sworn in their own interrogatory answers that several named individuals had knowledge of his prior bad acts and that prior to being hired by Daley College, Kennedy King College had rejected Torres' application for employment there on account of learning of his theft from Seton Academy.

Defendant has refused to answer the relevant interrogatory regarding its awareness of Torres' criminal history, claiming it would be burdensome to have to interview scores of

employees to determine the answer. Defendants have stated that Torres' personnel file, which it originally objected to producing but has now agreed to produce, would reveal his application materials and employment references. The employment file, however, would not reveal verbal communications and may not even mention the criminal history. In an effort to alleviate any burden concerns, Plaintiffs proposed that Defendant produce the information regarding Torres that was considered by the hiring committees at Kennedy King and Daley Colleges at the time he was being considered for those positions, and that Defendant only ask the three specifically named individuals identified by Plaintiffs' as having knowledge of Torres' criminal history: Elinore Moore, Mark Potter, and Griselda Silva. This should alleviate any burden but still provide Plaintiffs with Defendant's knowledge of Torres' wrongdoing at the time of hire by Defendant. Defendant's prior knowledge of Torres' prior crimes of dishonesty adds a layer of seriousness to Plaintiffs' reporting where the investigation into their reports of Torres' misconduct could expose that Defendants knew from the inception that Torres was a very problematic, frankly, negligent, hire, giving Defendant a reason to want to remove the whistleblowers and shut down any further investigation or discussion of Torres. The information is also relevant to disparate treatment between male and female employees where Plaintiffs have identified several other male employees who remained in their positions after committing misconduct while the Plaintiffs, all women, were fired for reporting the same. *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010)(evidence of disparate treatment supports a circumstantial showing of discrimination).

    iv.    **Defendant's Position:**

Plaintiffs' focus their case on Roberto Torres, an individual who was terminated by President Janosky after the OIG completed its investigations into allegations surrounding his misconduct at Daley. The revelation leading to Torres' termination are salacious, but they do not

establish the Plaintiffs' case. First, the circumstances surrounding Torres' hiring are wholly irrelevant to this case because Plaintiffs position is that they were retaliated against *after* making complaints about Torres, well after he was hired. Although Plaintiffs try to make hay that Torres should not have been hired in the first place, the fact remains that he was hired and later terminated after the OIG investigated his misconduct.

Second, by the time Torres was hired by Daley College his criminal record was expunged and did not appear on his background check. While Torres was found guilty of a misdemeanor on March 12, 2012, and served one year of supervision, on October 12, 2017, Torres' conviction was fully expunged. Torres began working at CCC in January 2018. But, more importantly, even if Torres' criminal history did appear on a background check (it did not), CCC would be statutorily barred under the Illinois Human Rights Act (IHRA) from considering Torres' arrest record or criminal record information that was expunged, sealed, or impounded as a basis to refuse to hire Torres. *See* 775 Ill. Comp. Stat. Ann. 5/1-103(B-5)(3); 775 Ill. Comp. Stat. Ann. 5/2-103(A).

Third, unlike the plaintiff in *Chaney*, Plaintiffs here cannot point to Torres as person outside of their protected group that received more favorable treatment. CCC maintains that Torres is not a comparator to Plaintiffs; but, to the extent that Plaintiffs attempt to make this argument, he was not treated better than Plaintiffs—he was terminated once the OIG investigative reports were completed.

In *Chaney*, one of the plaintiff's proffered comparators did not answer the bed alarm of a patient and was not even questioned about the incident while the plaintiff was terminated for swearing in the presence of a patient. *See Chaney*, 612 F.3d at 916. As a result, the *Chaney* court found that this disparity of treatment raised suspicion the motivation behind the plaintiff's termination was her race. *Id*. In contrast, here, the Plaintiffs were terminated as part of a

reorganization brought about, in part, by their poor leadership, while Torres was terminated after the OIG completed its investigations into misconduct. Torres was not treated better than Plaintiffs.

The circumstances surrounding Torres' hiring and alleged criminal history are irrelevant to Plaintiffs' claims, and therefore, this Court should not compel Defendant, on top of what it has already produced and agreed to produce, to identify all individuals who became aware of Roberto Torres' termination from Seton Academy and any allegations of misconduct made against him in relation to his employment with Seton Academy.

**Comparator Evidence Related to Disparate Treatment and Pretext**:

   D.   *Document Request No. 67 (regarding performance documents regarding the individuals hired into the newly created roles that Plaintiffs previously held)*:

      i.   Document Request 67:  All documents or files related to any employee who held the position of Dean and/or Associate Dean of Student Service (including on an interim basis) and/or an equivalent position such as Dean and/or Associate Dean of Student Development at any City Colleges of Chicago location at any time since 2016, and/or all documents related to his or her employment with Defendant, including but not limited to: any personnel, medical, or human resources files or documents; all documents reflecting his or her salary, compensation, and benefits history; all positions and job descriptions held by or offered to him or her; and all performance evaluations, commendations, and disciplinary actions taken or issued to him or her.

      ii.   Response:  CCC objects to this Request as overbroad and irrelevant to the claims and defenses in this case, except to the extent it seeks documents relating to Plaintiffs' employment with CCC. This Request is also unduly burdensome and disproportionate to the needs of this case as it would require CCC to gather the entire personnel and discipline histories of employees holding the positions in question at each CCC college over a five-year period. CCC further objects that the documents responsive to this Request are confidential.
      Subject to and without waiving its General or Specific Objections, CCC states that it will produce documents sufficient to show Plaintiffs' salary, compensation and benefits history, and personnel files for their tenures as Dean/Associate Dean of the Department of Student Services.

      iii.   **Plaintiffs' Position:**

The parties have largely reached agreement on this document request whereby Plaintiff has agreed to narrow the request to seeking, and Defendant has agreed to provide: the hiring and applicant packets for those hired into or interviewed for the positions of Dean and/or Associate

Dean of Student Service or Student Development at any CCC location at any time since 2016 and to disclose their salary information. The only dispute remaining for these requests is whether Defendant will provide the performance related documents for each of the new hires identified.

Specifically, Plaintiff requested that Defendant either: 1) produce the performance related documents of the individuals hired into these specified positions OR 2) stipulate that Defendant will not elicit or introduce evidence of poor performance on the part of any Plaintiff at the trial of this matter or in motion practice before this Court. Plaintiff made this request because Defendant has conceded that Plaintiffs were not terminated on account of work performance; yet, Defendant also produced draft performance improvement plans that it created for Plaintiffs Lynch and Rubio though admits it never issued to either. Defendant will only agree to stipulate that Plaintiffs were not terminated for their performance but expressly reserves the right to use evidence of poor performance at trial. Plaintiff's position is that Defendant cannot have it both ways. It cannot say this is not a work performance case to deny Plaintiffs discovery on comparator work performance while reserving the right to elicit and introduce evidence of Plaintiffs' alleged poor work performance. If it wants to call into question Plaintiffs' performance, the performance of those in the same positions Plaintiffs once held is relevant and Plaintiffs must be allowed to develop that evidence. *Askew v. Enter. Leasing Co. of Detroit*, LLC, 2018 U.S. Dist. LEXIS 140292 (Mich. E.D. August 20, 2018 (granting motion to compel discovery of comparators' performance even though defendant contended plaintiff was not terminated for performance, as "Defendant's anticipated defense initiates the pretext analysis for which the 'comparator' information would be most relevant."); *Chaney,* 612 F.3d at 916 (discussing relevance of comparator evidence).

iv.   **Defendant's Position:**

Defendant maintains that the Deans and Associate Deans at colleges other than Daley College are not appropriate comparators because they do not report to the decision maker at issue here, President Janosky of Daley College.  Nonetheless, the parties reached an agreement that Defendant will produce the application and hiring packets (which should include salary information) for any individuals interviewed or hired since 2016 for the role of Deans and/or Associate Deans of Student Service or Student Development at any CCC location, to the extent Defendant can locate such documents. Defendant will further produce any disciplinary files for Plaintiffs and all Dean direct reports to President Janosky. The Court, however, should not compel Defendant to produce "performance related documents" for all Deans and/or Associate Deans of Student Service or Student Development at any CCC location at any time since 2016 because the Deans and/or Associate Deans of Student Services or Student Development at other CCC colleges are not similarly situated to Plaintiffs. When determining whether a proffered comparator is similarly situated the Court looks to whether the employees in question had the same job description, were subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications. *See Good v. U. of Chicago Med. Ctr., 09 C 4802,* 2011 WL 2516535, at *3 (N.D. Ill. June 23, 2011), aff'd on other grounds, 673 F.3d 670 (7th Cir. 2012) (finding that the proffered comparators were not similarly situated to the plaintiff because they were not disciplined for the same reasons, were not terminated for the same reason, and were not disciplined by the same supervisors).

Here, Plaintiffs have no similarly situated comparators. The Deans and Assistant Deans at other CCC colleges were not subject to the supervision of President Janosky. The Deans and Assistant Deans at other CCC colleges worked under their college's respective President. President

Janosky's decision to reorganize the Department of Student Services was a decision she made for Daley College based on her observations and evaluations at Daley College. President Janosky could not make decisions regarding the employment of Deans or Assistant Deans at any other colleges.

The *Askew* upon which Plaintiffs rely, Defendant here does not argue that information they requested is irrelevant because its related to legitimate business reason defense. Rather, Plaintiffs here seek information unlikely to lead to the discovery of admissible evidence because Plaintiffs lack comparators. Simply put, the Deans and Assistant Deans at other colleges were not subject to sufficiently similar working conditions to be considered similarly situated because they worked at an entirely separate college under a different decision maker. Thus, the request is irrelevant and the Court should deny Plaintiffs' request beyond the compromise negotiated between the parties. Even if the request had some attenuated relevance to the issues of the case, the burden of gathering and producing the material would be disproportionate to the benefit, such that Plaintiffs' request should be denied.

E. *Saleh Interrogatory No. 11 (regarding disparate treatment)*:

   i.   Interrogatory:  State each and every reason Eduardo Garza was terminated from his employment with Defendant and identify each individual involved in the decision to terminate Mr. Garza from his position, stating when such decision was first discussed or suggested, when the decision was made, and describe each individual's role in the decision.

   ii.   Response:  In addition to its General Objections, CCC objects that this Interrogatory seeks information irrelevant to any claim or defense in this litigation, and that for the same reason it is disproportionate to the needs of the case, and oppressive. CCC makes no answer to this Interrogatory based on its objections.

   iii.   **Plaintiffs' Position:**

Plaintiffs have claimed for sex discrimination for being treated differently than their male counterparts, including as it related to Defendant's pattern of overlooking the misconduct of male

employees and retaining them in their employment after their misconduct has been exposed, while Plaintiffs –females who had not committed misconduct and enjoyed excellent work histories – were each terminated. *Id.* ("Evidence that similarly situated employees outside the protected class received better treatment can help support a circumstantial showing of discrimination.").

Plaintiffs identified several examples of this disparate treatment, including Eduardo Garza. Garza is an important comparator because he was terminated the same day as Plaintiffs, also in a purported position elimination. However, long before his termination from employment, Garza had been investigated by the OIG for his own misconduct, which resulted in an OIG finding against him in 2019, but he was not terminated when this finding was made. Instead, he was terminated much later, on the same day as Plaintiffs in January 2020. Defendants will undoubtedly point to his purported position elimination to provide cover for the elimination of Plaintiffs' positions as a legitimate business decision. The details and reasons for Garza's termination are thus relevant to disparate treatment and pretext regarding the asserted defense where a jury could find that Garza, who was long overdue for disciplinary action arising from the OIG finding against him, was only terminated the same day as Plaintiffs to make it appear as though Plaintiffs were not being targeted in a retaliatory manner. *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012)(discussing relevance of pretext evidence, finding "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation."). Plaintiffs have offered to narrow the scope of the interrogatory to only seek: who made the decision, when the decision was made, and all reasons for the decision.

           iv.    **Defendant's Position**:

Defendants maintain that Dr. Garza is not similarly situated to Plaintiffs. Dr. Garza was the former President of Daley College and Plaintiffs were Deans and Assistant Deans working

under him. In his final position at Daley College, Dr. Garza was the Vice President of Institutional Effectiveness.  The responsibilities and conditions of their employment was not comparable in any way. *See Saketkoo v. Admins. of Tulane Educ. Fund*, 31 F.4th 990 (5th Cir. 2022) (finding that male physicians female associate professor physician proffered were not valid comparators because they did not share similar research responsibilities, section assignments, or historical performances). Moreover, Dr. Garza cannot be a valid comparator for Plaintiffs because he, like them, was terminated as the result of restructurings.

When President Janosky became the President at Daley College, she spent her first semester evaluating the structure and leadership positions at the school to improve the efficiency and effectiveness of service provided to students of the college. President Janosky formed the opinion that Dr. Garza's position was no longer necessary and the Department of Student Services ("DSS") required restructuring due to, in part, to its dysfunction under Plaintiffs' leadership. President Janosky wanted to change the DSS into a Department of Student Development that focused on holistically working with students to help them develop into their full potential rather than simply providing student services in a transactional manner. Under President Janosky's evaluation, she did not believe that the goal could be accomplished with the DSS as it was constituted at the time, and as a result, Plaintiffs' positions were eliminated and they were terminated.

Plaintiffs' reliance on *Coleman* is misplaced.  In *Ortiz v. Werner Enterprises, Inc*., the Court clarified the "convincing mosaic test" used in *Coleman* was not a legal test and overturned all cases that used the "convincing mosaic test" as a requirement. 834 F.3d 760, 765 (7th Cir. 2016). The proper test is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's proscribed protected category caused the discharge or other adverse employment

action. *Id*. Nothing regarding Dr. Garza's termination would leave a reasonable jury to find that Plaintiffs were discriminated against because their sex because Garza was not similarly situated to Plaintiffs and he, too, was terminated.

Notwithstanding the irrelevance of discovery into Dr. Garza's employment, CCC did agree during the meet and confer conducted by the parties on April 20, 2020, to produce Dr. Garza's personnel file, which would include any documentation regarding his termination based on the elimination of his position. And, parties may point to documents in lieu of a narrative response to an interrogatory under FRCP 33(d) and that is effectively what Defendant agreed to do on April 20. Indeed, any narrative requested by Plaintiffs would be based largely on the documents in Garza's personnel file. Therefore, this Court should not compel Defendant to state "all reasons" Dr. Eduardo Garza was terminated from his employment with Defendant when Plaintiffs will have his personnel file.

/s/ M. Megan O'Malley
M. Megan O'Malley
O'Malley & Madden, P.C.
542 So. Dearborn St. Suite 660
Chicago Illinois 60605
312.697.1382
Attorneys for Plaintiffs
jmadden@ompc-law.com

*/s/* Ian H. Fisher
Ian H. Fisher (ifisher@taftlaw.com)
Reginald Lys (rlys@taftlaw.com)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000