## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EILEEN LYNCH, ERIN RUBIO, and ANEESA SALEH, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2021-cv-00366 |
| v. | ) ) | Judge Sara L. Ellis |
| BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 508 d/b/a CITY COLLEGES OF CHICAGO, | ) ) ) ) ) | Magistrate Judge Sheila M. Finnegan |
| Defendant. | ) ) | |

### SECOND JOINT MOTION TO RESOLVE DISCOVERY DISPUTES

Plaintiffs, through their counsel, and Defendant, through its counsel, and pursuant to Federal Rules of Civil Procedure 26, 33, 34, and 37, jointly move this Honorable Court for an order resolving discovery disputes, and in support of which state the following.

**Factual Background Relevant to the Discovery Disputes and Compliance with LR 37.2**

*Plaintiffs' Position*

This lawsuit was brought by three Plaintiffs alleging multiple violations of law in their ten-count Amended Complaint. The Complaint alleges that each Plaintiff engaged in multiple instances of protected activity of various natures spanning complaints of gender discrimination, pregnancy discrimination, sexual harassment, and involving disclosing fraudulent and unlawful  misconduct taking place within Richard J. Daley College (where they worked), which misconduct was ultimately the subject of an extensive investigation and finding made by City College's Office of Inspector General ("OIG"). Much of the misconduct Plaintiffs reported centers around one colleague, Roberto Torres, who was hired as Dean of Instruction at Daley College in February 2018.

1

Eleven days after the OIG made a finding of misconduct against Torres and issued its report, Defendant notified Plaintiffs, on January 22, 2020, that they were being terminated from their employment. Plaintiffs' terminations were then listed on a personnel report and presented to the Board Committee on Academic Affairs and Student Services on February 13, 2020, and sent to the Board of Trustees for consideration at its regular meeting the same day. Two days prior to Plaintiffs' terminations being presented to the Board, on February 11, 2020, Plaintiffs' counsel had sent a letter to Defendant asserting the terminations were retaliation for their reporting and set forth the detailed facts surrounding Roberto Torres' misconduct and identifying that Plaintiffs were the whistleblowers who reported him to the OIG. The Board discussed Plaintiff's terminations in a closed session of the meeting and voted in favor of terminating Plaintiffs' employment on February 13, 2020.

Plaintiffs contend this is not a work performance case, as Defendant had previously conceded the terminations were not connected with any assertion of poor performance, answering Plaintiffs' interrogatories to say, "Defendant does not contend [Plaintiff] was terminated because of poor performance." [Ex. A, Defendant's Answer to Lynch Interrogatory No. 9] Plaintiff contends that Defendant has asserted shifting reasons for the terminations, at various points asserting the terminations were merely position eliminations on account of pedagogical reasons, also asserting cost saving as a reason, and now – in the course of the litigation – claiming that the terminations were, in fact, performance based as well. [*See* Dkt. No. 68, Transcript of Proceedings of May 19, 2022 Hearing, at 15-16 "their lack of performance and the way the department was in total dysfunction did contribute heavily in President Janosky's decision to change the structure"]

No other positions in the department were eliminated. Roberto Torres, the individual who admittedly committed the misconduct, resulting in the OIG finding, was not terminated from his employment in January 2020 like Plaintiffs. Rather, he was terminated months later, only after Plaintiffs' hired counsel and asserted legal claims.

The parties have engaged in extensive conferring pursuant to Local Rule 37.2 on each of the discovery disputes Plaintiffs present herein, as will be discussed further in each of the respective sections.

Defendant's position below, as relating to compliance with Local Rule 37.2, purports that Plaintiffs have failed to comply with Local Rule 37.2 in failing to confer with Defendant and its ESI representative regarding the issues in this motion. This is categorically and demonstrably false. The truth is that Plaintiffs have been meeting with, talking over the phone with, emailing, and writing letters to Defendant for 20 months arduously attempting to obtain Defendant's full compliance with its discovery obligations, including to produce the discovery *already agreed upon*.

As for the ESI portion, Plaintiff's counsel has, in fact, conferred with Defendant and its ESI representative, as Defendant's ESI representative participated in one of the telephonic meetings to discuss the technical aspects of the ESI issues that existed at the time, but have since been resolved. All substantive and technical disputes over ESI were resolved on account of that meeting and others to follow. Indeed, as of November 1, 2022, the parties had reached full agreement on search terms, scope of results, and method of review, and on that date, Defendant agreed to commence its review of the resulting emails and to begin producing those emails on a rolling basis. At the time Plaintiffs provided their draft of this joint motion to Defendant – nearly 3 months after Defendant agreed to begin its rolling production – Defendant had produced zero emails. Not one. Defendant only produced its first batch *after* getting Plaintiffs' motion.[1] Importantly, Defendant admits that the review and production of emails remain incomplete. This motion does not ask the Court to resolve any substantive or technical disputes related to ESI. Rather, it only asks the Court to set a date certain

---

[1] Defendant implies that it produced the emails before Plaintiffs sent their motion to Defendants; thus, it was improper for Plaintiffs to bring the motion, as it was complying. This is also demonstrably false. Defendant produced its first batch the same day, but several hours after, receiving Plaintiffs' motion (clearly motivated by the motion), and Defendant concedes that the production remains incomplete.

by which Defendant must complete its review and production. Prior to bringing this motion, Plaintiffs asked Defendant at least twice to provide a date on which it would provide its first rolling production and Defendant refused to provide a date certain. Given the delays, Plaintiffs appropriately brought this motion seeking relief from the Court.

Plaintiffs have earnestly tried to work with Defendant time and time again and in the spirit of professionalism and Local Rule 37.2, attempting to resolve the disputes and obtain the discovery. However, this matter was filed two years ago in January 2020 and, by its own admission, Defendant still has not completed its discovery obligations to Plaintiff's to fully answer interrogatories and to fully produce document responses despite repeated promises to do so. In the status report filed in this matter on November 22, 2022 [See Dkt. No. 69], Defendant represented to this Court that it "anticipates serving its Third Supplemental Responses to Plaintiffs' discovery requests in the next few business days." Yet, nearly 3 months later, Defendant still has not done so. Indeed, many of Defendant's responses below simply repeat past promises that it will produce the requested materials. While Plaintiffs appreciate the commitment to doing so, Plaintiffs bring this motion to avoid any further prejudice to Plaintiffs on account of the continued delays and because certain disputes over sufficiency remain which are comprehensively presented to the Court herein for ruling.

### _Defendant's Position_

Plaintiffs' motion to compel discovery is not properly before this Court for several reasons. First, Plaintiffs have failed to comply with Local Rule 37.2's requirement to meet and confer. _See_ N.D. Ill. R. 37.2. As this Court's standing order concerning Discovery Motions and E-Discovery emphasizes, the rule requires, "other than in exceptional circumstances, communication that takes place face to face or by telephone. The mere exchange of correspondence will not normally be sufficient to comply with Local Rule 37.2." _See_ https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA== (emphasis omitted). Plaintiffs' counsel presented

4

their motion to Defendant's counsel on January 20, 2023, via email. (Email Enclosing Disc. Mot., Def.'s **Ex. 1**.) Neither in that email nor at any other prior time did Plaintiffs seek to meet and confer with Defendant in person or by telephone. No part of their motion says otherwise. This is despite the fact that many of Defendant's communications to Plaintiffs have invited them to "[p]lease let me know if you have any questions or would like to discuss." (*See* Pls.' Ex. G at 5; Pls.' Ex. I at 5; Emails Regarding Doc. Produc., Def.'s **Ex. 2** at 3, 13.)

Plaintiffs do not assert that any "exceptional circumstances" exist here that would excuse their failure to take Defendant up on its repeated offer. Indeed, Defendant maintains there is a reasonable probability that some of the disputes described in Plaintiffs' lengthy motion could be resolved without this Court's intervention with a meaningful effort and real-time communication. In an apparent rush to file their motion before the Court's scheduled January 31, 2023 status conference, Plaintiffs decided not to comply with Local Rule 37.2.

Further, as set forth in the sections below concerning specific disputes, this motion is the first time Plaintiffs have demanded some of the items of discovery. For others, Plaintiffs have already received the very documents they now ask the Court to compel Defendant to produce, which Defendant also explains in the sections below concerning specific disputes.

Second, Plaintiffs have failed to comply with this Court's standing order concerning Discovery Motions and E-Discovery. The second part of that order provides:

> If the parties have reached an impasse regarding the discovery of voluminous records from a database, server, computer, service provider or similar electronic storage facility (ESF), before filing a motion to compel, the parties are required to meet and confer with an IT representative of the ESF to be searched in order to determine the most effective way to retrieve the requested material. The party seeking the discovery should also bring its IT specialist to this meeting in order to discuss the proper format for the retrieval of the records. This electronic discovery conference must take place in person and both sides should be prepared to discuss specifically the parameters of both the search and the ESF.

https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==. Some of the

disputes Plaintiffs seek to bring to the Court's attention concern electronically stored information ("ESI"). But Plaintiffs have made no attempt to comply with any of these requirements. They have not contacted Defendant's counsel to schedule a meeting, ask who Defendant's IT representative would be, or identify their own IT specialist. Plaintiffs stress that their counsel and Defendant's counsel spoke on the phone one time with Defendant's ESI specialist present, but Plaintiff's own ESI representative was *not* present for that or any other communication between the parties. Thus, Plaintiffs remain out of compliance with the Court's standing order.

Third, Plaintiffs' attempt to file a motion that is many times the length allowed by the Court here circumvents this Court's structured process for resolving discovery disputes. Specifically, the standing order concerning Discovery Motions and E-Discovery limits joint discovery motions to five pages and states that only after oral argument at the motion call will the Court consider allowing the parties to file additional briefing (and will not usually grant such a request). Plaintiffs' draft motion sent to Defendant on January 20, 2023, was already 24 pages long before Defendant had the opportunity to state its positions regarding the issues raised. Now it is even longer.

Plaintiffs' above characterizations of the facts of this case are unfounded and highly disputed. Defendant will not add more length to an already overlong motion by noting all of those inaccurate characterizations; however, three of Plaintiffs' inaccuracies must be noted. First, the decision to terminate Roberto Torres' employment was made on February 10, 2020—*before* Plaintiffs' counsel sent her demand letter to the Board. The decision was communicated to Torres on February 13—not "months" after Plaintiffs' employments were terminated—and the Board approved Torres' termination at its next scheduled meeting.

Second, Defendant has not offered "shifting reasons" for Plaintiffs' terminations. Defendant has always maintained it terminated Plaintiffs' employment due to a restructuring of their department; performance-based terminations would have been handled in a different manner. The need for

6

restructuring the department was driven, in part, by Plaintiffs' lack of performance and their department's dysfunction. Indeed, when Plaintiffs asked early in discovery for a stipulation that the terminations had nothing to do performance, Defendant refused.

Third, other positions at Daley College were, in fact, eliminated or restructured at the same time as Plaintiffs' terminations. For example, the position of Vice President of Institutional Effectiveness was eliminated. The position of Director of Strategic Initiatives was added. Plaintiffs' three positions were eliminated. The new Student Development department has one dean and only one assistant dean. This saved the college money and promoted the President's operational and educational goals.

For purposes of this motion, Defendant notes additional facts relevant to the specific discovery disputes at issue below.

**Discovery Disputes at Issue**

**<u>Production of Emails</u>:**

<u>*Plaintiffs' Position*</u>

*History and Compliance with Local Rule 37.2*

In their document requests sent in May 2021, Plaintiffs identified a list of custodians for Defendant to conduct searches for Electronically Stored Information ("ESI") on their devices and in their email boxes. [Ex. B, RFP 89 and 90] After conferring about disputes over scope of custodians, the parties later agreed upon a list of custodians and Plaintiff sent an ESI protocol to Defendant. The protocol[2] listed specific searches pertaining to emails and otherwise reminded Defendant of its duty to gather and produce other types of ESI, including text messages, stating:

---

[2] The original protocol and Plaintiffs' initial request regarding custodians are attached hereto as Exhibit C.

> For each custodian, we have provided search terms for use with their e-mail boxes. However, please be mindful of your obligation to also search for their text messages. We know text messages exist between certain custodians and our clients, as we have produced those. We expect all text messages, not just those with our clients, to be produced. Please also be mindful of your duty to search and gather ESI from any audio or visual recordings (including Board meetings), and any internal messaging platforms such as intra-nets, Manager Connection, and Skype, which you have previously acknowledged is a platform CCC uses. The custodians personal and work issued devices, including cellular phones and laptop computers, should be searched for ESI that is in any way responsive to the document requests and/or otherwise related to the claims and/or defenses in this matter.

For email searches, Plaintiffs sent 12 separate searches with different search terms, custodians, and date ranges for each as a means to narrowly tailor the searches on account to the fact that there are numerous instances of protected activity in this matter, some of which involved all three Plaintiffs, some of which only involved 1 Plaintiff, and the various issues in the matter arise at different points of time. Additionally, Defendant maintains several departments that have become involved in the issues giving rise to this lawsuit, including an EEO office, a Title IX office, a Labor and Employee Relations Department, a Human Resources office, and the OIG.

Defendant did not produce any hit reports from the searches until nearly 4 months later in March 2022. After first resolving some issues with the format of the hit reports, which were re-submitted, Plaintiffs then reviewed the reports and agreed that the overall results (number of responsive emails) were excessive. Accordingly, Plaintiffs agreed to look for ways to narrow the searches. In so doing, Plaintiffs requested a sampling of certain results that seemed askew in order to determine why, for example, a specific search would yield 1 email but with 84 attachments, or why, as another example, a search for Roberto Torres's name with "tweet" or "Twitter" (designed to discover discussions of a relevant tweet sent by Torres) would yield thousands of results.

The sampling was not run in accordance with how Plaintiffs requested, and Plaintiffs ran into significant difficulty trying to decipher the results, having to hire an outside ESI consultant at their expense, to assist. Nevertheless, the parties continued to work collaboratively, and Plaintiffs were then able to glean enough information from the sampling and Defendant's explanations to identify

certain problems giving rise to excessive results. For example, some employees of Defendant have a Twitter handle listed in their email signature blocks, which resulted in any email they exchanged with or that discussed Torres being responsive to a search for Torres and Twitter. Plaintiffs, thus, agreed to eliminate this search altogether.

In August 2022, Plaintiffs sent Defendant revised searches as a means to narrow the results. Plaintiff eliminated numerous searches altogether and narrowed scores of other searches. Defendant ran the revised searches and provided new hit reports on September 23, 2022. The parties then conferred in October 2022 about Defendant's expressed intent to conduct its review of the resulting emails pursuant to Technology Assisted Review ("TAR") to address Plaintiffs' concerns, as certain types of TAR reviews can be very problematic.

After conferring and reaching agreement on the manner of review, Plaintiffs asked Defendant, on November 1, 2022, to begin the review of the emails and to provide a rolling production as it conducted its review. Defendant agreed to providing a rolling production. Since that time, Plaintiff has not received any email production at all and has asked Defendant for a status of review and to provide its initial production, as agreed, on a rolling basis. As of January 20, 2022, Defendant has not produced a single email from the searches, has declined to provide Plaintiff with a requested date on which Defendant would begin review, stating only that it "expect[ed] the **first** rolling production from the ESI corpus to be ready for production to Plaintiffs" the week of January 23rd. [*See* Ex. D, 1/16/23 Email Exchange (emphasis added)]

### *Defendant's Position*

As noted above, Plaintiffs have not complied with Local Rule 37.2, with respect to both the telephone/in-person requirement and the requirement to meet and confer with ESI professionals.[3]

---

[3] Counsel for Plaintiffs and counsel for Defendant spoke on the phone on October 17, 2022, regarding ESI search terms, hit reports, and related topics. But, Plaintiffs' counsel did not raise the issues they discuss and seek relief from the Court for in this motion. (*See* Def.'s Ex. 5 at 4.)

Indeed, Plaintiffs provided their 24-page draft joint motion to Defendant on January 20, the same day Defendant provided the first rolling production of ESI, which consisted of more than 3,000 documents and 10,000 pages. Defendant made this production in the week before it had promised to do so.

Additionally, Plaintiff demanded ESI searches that are uncommonly structured and very complicated. For example, as explained in Defendant's September 13, 2022 letter to Plaintiffs regarding this issue:

> "Search 6" per your protocol consists of *33 separate search queries* to be run against *18 different custodians*. This required us to set up 18 different searches in Relativity [an online e-discovery platform] and run the 33 terms against each of these 18 custodians to generate custodian-level reporting, or *594 searches*. Likewise, "Search 7" consisted of *18 custodians*—a different than the ones for "Search 6"—and *18 separate search queries*, requiring us to set up another 18 searches and run the 18 terms to generate custodian level reporting, or *324 searches*.

> This exercise continued across all of the 12 sections in your protocol, resulting in 177 hit reports (i.e., the total number of custodians requested across all of the search sections), comprising 299 search queries—i.e., the total number of terms across all the search sections. Notwithstanding the extraordinarily manual nature of this work, we complied, and even continued to provide you with refined search term reports at the custodian-level based on your decision to nuance discrete queries within each search section.

> As you can see, the parameters you dictated—which we never disputed—transformed your request for custodian-level reporting into a meticulously exacting manual task.

(Def.'s Sept. 13, 2022 Ltr. to Pls., Def.'s **Ex. 3** at 3) (emphases added.) Defendant ran all of Plaintiffs' searches, provided hit reports and even a sample production of documents, and ran the terms again when Plaintiffs revised them. Throughout the process of negotiating an e-discovery protocol, Defendant has been communicative and transparent. (*See, e.g.*, *id.*; Def.'s June 6, 2022 Ltr. to Pls., Def.'s **Ex. 4**; Emails Regarding ESI Protocol, Def.'s **Ex. 5**.)

### *What Plaintiffs Seek to Compel*

While Plaintiffs appreciate the collaborative nature in which the parties have worked through ESI issues, due to the delays in obtaining the production of emails, including that none have been

produced, Plaintiff respectfully requests that this Court enter an order setting a date certain on which Defendant must complete its review and production of all emails.

This matter has been pending for two years, during which time the parties have spent considerable time exchanging written discovery and resolving issues related to the same. However, Plaintiffs would like to advance the matter to oral discovery, and ultimately to trial, but are prevented from doing so without first obtaining the outstanding written discovery from Defendant. It is axiomatic that Plaintiffs would suffer prejudice were they to have to proceed to oral discovery and take depositions of individuals whose emails have not yet been produced. Taking depositions and defending the depositions of Plaintiffs prematurely would deprive Plaintiffs of a full and fair ability to prepare for those depositions, as the information related to each witness would be incomplete. *Harlem Carpet & Tile Mart v. Mohawk Carpet Distribution*, 2011 U.S. Dist. LEXIS 132179, at *11 (N.D. Ill. Nov. 16, 2011)(recognizing that "the parties will want to complete [written discovery] and have an opportunity to review those documents before they take depositions"). Moreover, and perhaps more importantly, Defendant has been in possession of these emails for several months and has been reviewing the same. It certainly would be improper for Defendant to have had access to a significant portion of the record and to prepare for depositions on documents it has itself reviewed (at least in part), but has not yet tendered to Plaintiff. To avoid this prejudice, as well as the likelihood of having to re-open depositions to examine witnesses on documents later produced, and to allow the matter to advance in a timely fashion, Plaintiffs ask the Court to compel Defendant to begin production of the emails it has already reviewed (having begun its production on November 1, 2022) and to further set a date certain by which Defendant must complete its full review and production of emails to Plaintiffs.

### *Defendant's Position: Documents Produced on Schedule*

The entirety of the relief that Plaintiffs ask for with respect to this issue is for the Court to

compel Defendant to begin producing documents from the ESI corpus and to set a date by which that production must be complete. This is unnecessary because Defendant has already produced its first rolling production of ESI documents to Plaintiffs. It did so on January 20, 2023, and that production is substantial—over 3,000 documents, comprising nearly 10,000 pages. (*See* Email Regarding Jan. 20, 2023 ESI Produc., Def.'s **Ex. 6**.) Defendant will produce a second rolling production within the next seven days and its review and production of documents will continue until completed.

Moreover, Defendant has consistently communicated updates to Plaintiffs on its progress here, making Plaintiffs' motion even more unnecessary. In its September 27, 2022 letter to Plaintiffs, Defendant noted that its "review of the ESI corpus has only just begun." (Pls.' Ex. I at 2.) On December 13, 2022, Defendant's counsel told Plaintiffs' counsel in an email that: "We are also planning to produce responsive docs from the ESI corpus in a few rolling productions, and expect the first of these to be ready shortly after the holidays." (Def.'s Ex. 2 at 7.) Counsel provided another update via email on January 7, 2023: "Defendant anticipates producing a substantial number of ESI documents later this month. As review is currently ongoing, we cannot estimate when the review and final production will be complete." (*Id.* at 3.) Plaintiffs' counsel's response speaks for itself. (*See id.* at 2.)

Thus, Plaintiffs' assertion that Defendant "has declined to provide Plaintiff with a requested date on which Defendant would begin review" of the ESI corpus is objectively false. Defendant produced the 1st batch and is reviewing the remaining documents from the ESI corpus, and Plaintiffs know this. In the meantime, Plaintiffs are not "prevented" from advancing this case to "oral discovery." Despite their claim, this Court's standing order concerning Discovery Motions and E-Discovery provides that "there is no 'order' or sequence in which discovery must take place." And Plaintiffs refused to produce Plaintiff Aneesa Saleh for a deposition noticed by Defendant on August

24, 2022, for September 8, 2022. (*See* Emails Regarding Saleh Dep., Def.'s **Ex. 7** at 2–4; Notice of Saleh Dep., Def.'s **Ex. 8**.) Thus, Plaintiffs have actively prevented "oral discovery" from taking place. Additionally, to the extent Plaintiffs claim they must review Defendant's ESI documents before sitting for deposition, they provide no reason why this should be so. Their testimony about their recollections regarding this case should not change as a result of them reviewing Defendant's additional documents.

Finally, Plaintiffs' purported concern about Defendant having the opportunity to review its own documents before Plaintiffs receive them is misplaced. First, these are Defendant's own documents. Defendant has always had possession of them and nothing is improper about Defendant having possession of its own documents before providing them to Plaintiffs. Second, Defendant has been diligently reviewing the large corpus of ESI generated by Plaintiffs' ESI protocol for responsiveness and privilege. Such review is a necessary step for Defendant to produce the ESI to Plaintiffs. Defendant has not been engaged in deposition preparation—it is simply identifying the documents that are to be produced.

**Production of Text Messages:**

*Plaintiffs' Position*

*History and Compliance with Rule 37.2*

In Plaintiffs' first set of document requests sent in May 2021, Plaintiffs requested that Defendant produce all communications, including text messages, "between either Janine Janosky or Anne Panomitros with any employee, agent, or investigator from the Office of Inspector General at any time from October 2019 through February 2020" and additionally requested that the devices of all custodians be searched for responsive text messages related to the matter. [Ex. E, RFP 37; Ex. B, RFP 89 and 90]. Plaintiffs' ESI protocol again reminded Defendant of its obligation to search for text messages on the custodians' personal and work-issued devices. [Ex. C, ESI protocol]. Despite

the protocol's clear delineation between emails and text messages, stating plainly that the searches provided were "for use with their email boxes," Defendant informed Plaintiffs that it had run the search terms on the text data. Unsurprisingly, as individuals do not talk in texts as they do in emails, very few texts were produced. Plaintiffs reminded Defendant that using the email searches was neither requested, nor was it a proper method at all of searching for responsive text messages. Plaintiffs requested that Defendant conduct a proper search of text messages "for any reference to the Plaintiffs by first or last name, for any reference to Roberto Torres by first or last name and, for any reference to 'OIG' or 'inspector general." [Ex. F, 8-25-22 letter]

Despite the limited nature of Plaintiffs' request, Defendant refused to re-run its searches, instead maintaining that it is proper to use e-mail search terms on text data. [Ex. G, 9-27-2022 letter] The parties engaged in further communications regarding this issue, and Defendant eventually claimed that it had no responsive communications within its possession, that decisionmaker Janine Janosky had lost her cell phone, and that custodian Michael Held refused a search of his phone. *Id.* On November 22, 2022, Defendant provided a list of the custodians it allegedly tried to contact to request text message data. Plaintiffs find this answer to be wholly insufficient and maintain that Defendant has not yet fulfilled its obligation to produce all responsive text messages within its possession, custody, and control.

*What Plaintiffs Seek to Compel*

Plaintiffs request an order from the Court compelling Defendant to conduct a proper search and produce all responsive text messages by a date certain. Plaintiffs have repeatedly requested that Defendant conduct a proper search, provide a list of custodians whose phones Defendant has allegedly searched, and – because Defendant contended it did not have control over personal devices (which are used by all employees, as they are not given City Colleges issued phones) – to provide contact information and cell phone carriers for every custodian who refused a search or who

14

Defendant was unable to contact. In Defendant's letter of November 22, 2022, Defendant responded

to Plaintiffs request as follows:

> To your inquiry regarding Defendant's efforts to collect, search, and produce responsive
> text messages, we identified the following potential custodians and attempted to contact them to
> learn whether they possessed text messages on their personal cell phones relating to Plaintiffs or
> the allegations in the case. Below are the results of those inquiries: A. Allen - No texts
>
> - A. Panomitros - No texts
> - A. Pro - No texts
> - C. Dunning - No texts
> - D. Bailey - No texts
> - D. Muhammed - No texts
> - D. Ritchie - Unable to contact
> - E. Nichols - No texts
> - E. Rios - Unable to contact
> - G. Silva - No texts
> - J. Hollie - Unable to contact
> - J. Janosky - No texts
> - J. Michel - No texts
> - J. Salgado - Yes
> - M. Held - Refused
> - R. Martin - No texts
> - S. Krah - Possibly
> - M. Yolich - No texts
> - S. Rhee - No texts

Defendant's answer remains deficient in several ways. First, Defendant has not explained

what attempts it made to contact the custodians it was allegedly unable to contact. As to those who

Defendant was able to contact, the primary concern is that Defendant has conceded that it ran email

search terms on phones it was permitted to search. Again, this is improper, deviated from the

protocol, and would naturally yield little to no results. It remains unclear, though, whether Defendant

conducted an attorney supervised search of its employees' phones or simply relied on self-reporting,

as Defendant has refused to explain what steps it took to "learn whether they possessed text

messages." Defendant's assertion that Stephanie Krah "Possibly" has responsive texts is equally

concerning as Defendant has not explained what its "Possibly" designation means. Moreover,

Defendant's letter of November 22, 2022, states that "[t]ext messages were collected from the cell

phones of Dr. Janosky, Vice Chancellor Krah, and Chancellor Salgado." Defendant has not produced any text messages from Janosky or Krah and has produced only two pages of text messages from Salgado. Defendant also contradicted itself by claiming first, that Janosky lost her phone, and second, that Defendant collected text messages from her.

Although Plaintiffs have asked for information regarding the alleged theft of Janosky's phone, including that she provide the circumstances under which the phone went missing and produce any police reports she filed and receipts for any new phone she purchased, Defendant maintains that these requests are outside the scope of Plaintiffs' discovery requests. [Ex. I, 11-22-2022 letter at 3] Yet, as Defendant is aware, the courts expect parties to cooperate with each other as relating to discovery of electronic information, which includes a fair exchange of information informally. *See Cary v. Ne. Ill. Reg'l Commuter R.R. Corp*, 2021 U.S. Dist. LEXIS 31806, at *12 (N.D. Ill. Feb. 22, 2021). Moreover, if Janosky lost her phone after her duty of preservation began, and she did not make any efforts to preserve her text data, Plaintiffs are entitled to this information. Most phones preserve texts in the cloud and download text messages to a new phone.

Plaintiffs have also requested that Defendant provide the contact information and cell phone carriers of those custodians who refused to comply with a search or who Defendant was unable to contact. Defendant has similarly responded that these requests are also outside the scope, improperly preventing Plaintiffs from subpoenaing the text data. [*Id.* at 4]

Contrary to Defendant's contention that it has no legal right to access its employees' personal devices, Defendant's Employee Manual expressly provides this right to Defendant and, in fact, requires its employees to cooperate with Defendant in conducting legal investigations and assist Defendant "in defending CCC in litigation by providing the General Counsel and their legal staff with accurate and complete information within the employee's knowledge and timely access to documents within the employee's custody or control," which would include employees' text

16

messages.[Ex. L, CCC_0000498]

It is clear that Defendant has not conducted proper searches of its employees' devices. Accordingly, Plaintiffs ask the Court to compel Defendant to conduct an attorney-supervised search of each custodian's cell phone and to produce responsive texts by a date certain and in conjunction with an affidavit of completeness. *See Sage Products v. Chemrite Copac*, 2021 U.S. Dist. LEXIS 219454, (N.D. Ill. Nov. 12, 2021)(granting motion to compel text messages where party had "failed to search for, review, and produce its employees' text messages" and ordering party to produce text messages within 30 days). As the vast majority of custodians remain employed by Defendant, and certain others (such as decisionmaker Anne Panomitros) are represented by Defendant's counsel, the ability to search and gather is within Defendant's control. For former employees or any custodian who refuses such a search, or for those Defendant is unable to contact after a reasonable effort, Plaintiffs ask that the Court compel Defendant to supply the mailing address and cell phone carrier of each custodian so that Plaintiffs may subpoena the requested information.

### *Defendant's Position*

"[F]ederal courts have consistently held that documents are deemed to be within the possession, custody or control for purposes of Rule 34 if the party has actual possession, custody or control, or has the legal right to obtain the documents on demand." *Kokak LLC v. Auto-Owners Ins. Co.*, No. 2:18-CV-177, 2019 WL 4439868, at *3 (N.D. Ind. Sept. 17, 2019) (cleaned up). Because Plaintiffs seek production here, they bear the burden to "establish that Defendant[ ] ha[s] control of the requested text messages." *Krishnan v. Cambia Health Sols., Inc.*, No. 2:20-CV-574-RAJ, 2021 WL 3129940, at *2 (W.D. Wash. July 23, 2021). Defendant does not issue employer-owned mobile phones to any of its employees at issue here. Defendant does not own their phones or their wireless provider accounts. Defendant thus has no legal right to access its employees' personal devices.

Federal courts have found that an "at-will employer generally does not have a right to possess

17

text messages stored on its employees' personal cell phones that is equal to or superior to the rights of the employees who own and have physical possession of the devices." *Teague v. Omni Hotels Mgmt. Corp.*, No. A-19-CV-00940-JRN, 2020 WL 7012004, at *4 (W.D. Tex. Aug. 26, 2020) (cleaned up). As a result, courts have frequently denied motions to compel in this context. *See, e.g.*, *Krishan*, 2021 WL 3129940, at *2 ("[T]he personal cell phones were not issued by Defendants, and Plaintiff has not established that the devices are routinely used for business purposes or to what extent. Moreover, the Court finds that Defendants do not have a legal right to obtain the communications from its employees' personal cell phones based on company policy, as argued by Plaintiff. . . . The Court finds that Plaintiff has not met its burden to establish that Defendants are in 'control' of the requested communications and DENIES the motion to compel the requested employees' text messages."); *Shackleford v. Vivint Solar Dev., LLC*, No. CV ELH-19-954, 2020 WL 6273892, at *5 (D. Md. Oct. 26, 2020) ("The Court will not order the production of text messages [in similar circumstances]"); *Teague*, 2020 WL 7012004, at *4 ("Plaintiff cannot show that Omni has possession, custody, or control over any text messages responsive to a request for production and can be compelled to produce them." (cleaned up)); *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 2018 WL 6305665, at *7 (D. Or. Dec. 3, 2018) (finding lack of control of the requested cell records or calendars because there was no evidence members used their personal cell phones or calendars for more than *de minimis* work purposes); *Cotton v. Costco Wholesale Corp.*, No. 12-2731-JW, 2013 WL 3819974, at *6 (D. Kan. July 24, 2013) (similar).

Moreover, several other concerns militate in favor of denying Plaintiffs' motion here. As the court in *Shackelford* noted:

> If the Court were to order the production of responsive text messages on the personal cell phones of Vivint's Senior Management, the burden and expense for Vivint would be substantial. Vivint would have to ask former and current members of its Senior Management to allow a Vivint IT person or a third-party vendor access to his or her cell phone in order to search the contents of the phone for responsive text messages. Not only would this be a potential invasion of privacy to which the employees might

> lodge an objection or seek a protective order, but it would be expensive and time-consuming. And it is unclear whether it would yield any benefit to plaintiff. Indeed, plaintiff, through counsel, stated on the call that she did not know if any responsive text messages existed. To the extent a search of the phones did result in some relevant information, its likely benefit is outweighed by the burden and expense of obtaining it.

2020 WL 6273892, at *5 (footnote omitted). These concerns apply here as well. The burden on Defendant and its employees would be great and Plaintiffs have not articulated a specific need for the personal text messages of Defendant's employees. Their request is thus overly burdensome and not proportional to the needs of the case.

Nevertheless, Defendant made good faith attempts to obtain text messages from its employees. It requested each employee identified by Plaintiffs—including former employees for whom Defendant had current contact information—search their personal devices for responsive texts and report back to Defendant. Defendant shared those responses with Plaintiffs in its November 22, 2022 letter. (Pls.' Ex. I at 4.) Most employees reported that they did not have responsive text messages. (*Id.*) One refused to answer. One (Stephanie Krah) stated that she "[p]ossibly" has responsive texts but had problems with searching her phone. As noted below, Defendant followed up on this. (*Id.*) Defendant identified three employees (including Krah and Janosky) who were likely to have responsive text(s) on their devices. As stated in the letter, these three employees allowed Defendant to collect text messages from their personal devices. (*Id.*) At its own expense, Defendant hired a third-party ESI vendor to electronically search each of the three personal devices using the ESI protocol provided by Plaintiffs. Defendant produced responsive text messages from those phones. (*See id.*) Defendant's efforts to comply with its discovery obligation are therefore nowhere near deficient. To the contrary, Defendant has gone above and beyond.

Defendant's letter also communicated to Plaintiffs its position that their requests for information concerning Dr. Janosky's lost cell phone and the cell phone carriers and contact information of various current and former employees of Defendant are outside the scope of

Plaintiffs' discovery requests. (*Id.*) In the three and a half months since, Plaintiffs have not served any additional discovery requests on Defendant to obtain this information. And, in any event—as Plaintiffs know—contact information for current employees of Defendant is publicly available. Indeed, Plaintiffs have not even raised their request for this contact information of the ESI custodians in the context of a meet and confer.

Additionally, Plaintiffs' attempt to point out a supposed contradiction in Defendant's position regarding Dr. Janosky's cell phone misses the mark. The reality is that Dr. Janosky's cell phone went missing and was likely stolen. She replaced it and Defendant collected text messages from the replacement phone. As may be expected in such a situation, none were responsive.

As for Plaintiffs' argument that it was somehow improper to use the exhaustive ESI search terms they drafted to search for responsive text messages, text messages are ESI. And, Plaintiffs' belated complaints about Defendant's use of Plaintiffs' ESI protocol did not occur until after it had incurred the time and expense of using the protocol to search the phones. More importantly, as explained above, Plaintiffs' ESI protocol was exhaustive. The searches Plaintiffs now request be performed on the text messages would not yield any responsive texts that would not have been identified based on the searches (using terms Plaintiffs drafted) that Defendant did run. For example, search 7 would have identified a text referring to the "OIG" or "inspector general." (ESI Protocol, Def.'s **Ex. 9** at 9.)

The policy from Defendant's employee handbook to which Plaintiffs refer is entirely irrelevant with regard to former employees. Yet, Defendant still contacted former employees for whom it had current information and inquired if they had any responsive texts. Further, the policy does not give Defendant a right to access or search its current employees' personal cell phones. It only states that employees are to cooperate in gathering information and documents. Here, they did exactly that. Defendant asked its employees to search their personal devices for text messages related

to Plaintiffs or their allegations in this case. All except one did so and reported back to Defendant the results of their searches. For those who indicated that they might have responsive text messages—as well as those who Defendant otherwise had reason to believe might have responsive texts—Defendant hired a third-party ESI vendor to electronically search their phones for responsive documents. Defendant then produced the documents that were responsive.

**Defendant's Privilege Log Entries 11, 12, and 19:**

*Plaintiffs' Position*

*History and Compliance with Rule 37.2*

In the first Joint Motion to Resolve Discovery Disputes filed in this matter, Plaintiffs challenged the privilege asserted by Defendant in moving to compel full responses to Document Request Nos. 10, 11, 13, and 88 relating to communications about Plaintiff's terminations with the Board of Trustees, including as discussed in closed session of the Board meeting. [*See* Dkt. No. 50, p. 12; Ex. J, 5/19/22 Transcript] Defendant agreed, in the body of that motion and in open court, that it would amend its privilege log. [*See* Dkt. No. 50, p. 12] The Court opined that if, in closed session, counsel for the Board was providing legal advice, then that would be privileged; however, the Court also stated: "If there's anything that occurred in the board meeting that falls outside of that, then I would see. You can send that to me *in camera* and I'll take a look at it." [Ex. J, Transcript p. 8] Defendant did not send the Court any materials.

Defendant has since amended its privilege log twice, most recently on September 28, 2022. Plaintiff challenged the privilege as to Entries 11, 12, and 19 and asked Defendant, on August 25, 2022, to withdraw the privilege and produce the materials. On September 27, 2022 Defendant declined to withdraw the privilege or produce the responsive documents. On October 13, 2022, Plaintiff asked Defendant to produce the materials with redactions for any content it continued to deem privileged, as the full content would not be privileged. [Ex. H, 10/13/22 Letter] On November

22, 2022, Defendant replied that it would not produce the materials in unredacted form. As Plaintiff

does not believe the materials in these three entries are privileged, Plaintiff brings this motion. The

entries at issue are set forth below and the full log is attached hereto as Exhibit K.

| 11 | 2/12/2020 | N/A | Email | Valerie Harper | Aaron Allen (EEO & Labor & Employee Relations); Diandra Ritchie (EEO, Labor & Employee Relations); Micki Yolich (Labor & Employee Relations) | Request from counsel for material potentially responsive in impending litigation. | Attorney-Client Communication Privilege; Attorney Work Product Protection |
| 12 | 2/12/2020 | | Email | Tracy Fleming | Karla Gowen; Juan Salgado; Walter E. Massey (Chair of Board of Trustees) | In this email, Mr. Fleming forwarded the 2/11/20 letter from Megan O'Malley to K. Gowen concerning the Plaintiffs' termination and threatening litigation. He also repeated advice and recommendations to the Board about the letter and threatened litigation given by Karla Gowen (General Counsel). He sent this email forwarding Ms. O'Malley's letter prior to the 2/13/2020 Board meeting. | Attorney-Client Communication Privilege; Attorney Work Product Protection |
| 19 | 2/13/2020 | N/A | Audio/video | Daley College Board of Trustees, Karla Gowen | | Recording of a closed session of the Board meeting held on 2/13/2020. A description of the motion for closed meeting appears in the minutes of the open meeting the same day, which have been produced. In the closed session, Karla Gowen (General Counsel) provided legal advice to the Board about a 2/11/22 letter from M. O'Malley concerning the Plaintiffs' terminations and threating litigation if the Board ratified the terminations. Near the end of the closed session, two additional matters that were not related to the Plaintiffs, their claims, or Daley College were discussed. | Attorney-Client Communication Privilege; Attorney Work Product Protection |

### Defendant's Position

Plaintiffs have not shown that *in camera* review is necessary or appropriate here under the

Court's prior ruling.

> Federal courts should certainly not be in the business of always conducting *in camera*
> reviews every time a party moves to compel documents identified on a privilege log.
> Privilege logs are the means by which the opposing party and the Court identify the
> basis of the privilege and ascertain whether the privilege is properly invoked without
> the need to go further. Attorneys also have their own professional responsibilities and
> duties to properly invoke the privilege, with a basis in fact and law, and not always be
> second-guessed by the courts when a proper and detailed privilege log has been
> produced.

*Billy Goat IP LLC v. Billy Goat Chip Co. LLC*, No. 17-CV-9154, 2019 WL 10250940, at *4 (N.D. Ill.

Feb. 1, 2019). During the hearing on the parties' previous discovery disputes, the Court did not invite

the parties to seek *in camera* review for every dispute involving a claim of privilege. (*See* Pls.' Ex. J at

7:18–8:5.) Instead, it stated that *in camera* review of one specific entry of Defendant's privilege log

22

(Entry 19, the recording of the Board of Trustees' closed session on February 13, 2020) might be appropriate in one specific situation: if it fell outside providing legal advice and discussing the potential lawsuit. Here is the Court's ruling in context:

> Okay. So what I want you to do is send a response explaining how and when the board received the letter. As to what happened at the closed session where it was being -- you know, if it is that what occurred in the closed session was essentially *counsel for the board providing legal advice and discussing the fact that this lawsuit was a potential if the board ratified terminating these plaintiffs*, then that's protected.

> If there's anything that occurred in the board meeting that falls outside of that, then I would see. You can send that to me *in camera*, and I'll take a look at it. I don't know. It would have to be relating to these plaintiffs, not anything else that was discussed.

(Pls.' Ex. J at 7:18–8:5 (emphasis added).) The privilege log's description of Entry 19 shows that the entirety of its content is legal advice given to the Board by its General Counsel regarding the threatened litigation here, except for "matters that were not related to the Plaitniffs [sic], their claims, or Daley College." (Pls.' Ex. K at 2.) Thus, there is nothing for the Court to review *in camera*. Entry 19 falls within the Court's prior ruling.

### *What Plaintiffs Seek to Compel*

A. <u>Entry 11</u>

#### *<u>Plaintiffs' Position</u>*

In Entry 11, Defendant claims attorney-client privilege and work product protection over an email sent from Valerie Harper to multiple recipients and provides the following description: "Request from counsel for material potentially responsive in impending litigation".

It is well established that the attorney-client privilege protects the "giving of professional advice" from an attorney to their client. *Kodish v. Oak Brook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 452 (N.D. Ill. 2006). It does not, however, provide a blanket claim of privilege over all communications between attorney and client. *Id.*; *see also Smith v. Board of Education*, 2019 U.S. Dist. LEXIS 102326, at *3 (N.D. Ill. June 19, 2019)("privilege is limited to situations in which the attorney

is acting as a legal advisor," finding decisions regarding termination of employees are business decisions). The attorney-client privilege specifically applies "[w]here *legal advice* of any kind is sought." 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev 1961)(emphasis added). Defendant has not asserted that any legal advice was given or sought in the email listed in Entry 11. While Entry 10 describes an email as "Legal advice," Entry 11 describes a "request" for information. [Ex. K, Privilege Log] *Deakin v. Old Town Triangle Ass'n*, 2021 U.S. Dist. LEXIS 196508, at *2 (N.D.Ill. Feb. 12, 2021)(ordering defendant to produce documents whose privilege log descriptions did not suggest that legal advice was being shared or discussed). Defendant has not indicated in any way that its request involved any legal opinion.

Nor has Defendant established that the communication contained materials created in anticipation of litigation such that the work product privilege would apply. "Documents that would have been created irrespective of litigation are not considered to be work product." *Smith*, at *9 and n.3 (N.D. Ill. June 19, 2019)("[m]aterials created in the ordinary course of business which may have the incidental effect of being helpful in litigation are not privileged"). The log here requests existing materials and describes them only as "potentially responsive in impending litigation." This does not give rise to the work product privilege.

As Defendant has failed to establish the essential elements of the attorney-client or work product privileges, as is its burden, Plaintiffs ask this Court to compel Defendant to produce the email listed in Entry 11. *Kodish*, 235 F.R.D. at 452; *Smith*, at *9.

Alternatively, Defendant should be required to produce the materials for *in camera* inspection, as the Court initially requested, and particularly where the Seventh Circuit has found, "[o]nly when the district court has been exposed to the contested documents and the specific facts which support a finding of privilege under the attorney-client relationship for each document can it make a principled determination as to whether the attorney-client privilege in fact applies." *In re Grand Jury*

*Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000). Upon *in camera* review, the Court will be best suited to determine what portion, if any, of the communication is privileged.

### *Defendant's Position*

Plaintiffs argue that Entry 11 of Defendant's privilege log is not privileged because it is a request for information. But their narrow view of the attorney-client privilege is not supported by precedent. It is well established that "documents reflect[ing] requests for information from attorneys to the client for the purpose of providing legal advice" are protected by the attorney-client privilege. *In re Application for an Ord. for Jud. Assistance in a Foreign Proceeding in the Labor Ct. of Brazil*, 244 F.R.D. 434, 441 (N.D. Ill. 2007) (denying motion to compel such documents); *see Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 316 (N.D. Ill. 2010) ("The attorney-client privilege protects communications made in the course of an attorney's factual investigation when that investigation is made in order to provide legal advice."). Entry 11 is exactly this sort of document, and its description in the privilege log reflects this. As a "[r]equest from counsel for material potentially responsive in impending litigation," this email—sent the day after Plaintiffs' counsel sent a demand letter to Defendant's General Counsel, Karla Gowen—requested information for purposes of providing legal advice to Defendant regarding this litigation, which was, at the time, "impending." Plaintiffs' counsel is not entitled to know what counsel was asking for after receiving their demand letter. It is therefore protected from disclosure.

B. Entry 12

### *Plaintiffs' Position*

In Entry 12, Defendant claims attorney-client privilege and attorney work product protection over an email sent from Tracy Fleming, who is not a lawyer, to the Chancellor and to the Chair of the Daley College Board of Trustees, neither of whom are lawyers, and to Defendant's in-house attorney, Karla Gowen. The email forwards an email from Plaintiff's counsel (clearly not privileged)

and while the log describes the email as repeating legal advice, this does not render privileged the entire email or Mr. Fleming's specific communications to non-lawyers. Any portions that do contain legal advice can be redacted.

Merely including Defendant's attorney on the email is insufficient to establish that the communication is privileged. *See Smith*, at *8 ("it cannot be said that the primary purpose of these e-mails was to secure legal advice" where the "e-mails in question were prepared by non-attorneys and sent to other non-attorneys…with a copy to[counsel]"); *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 316 (N.D. Ill. 2010). It is well-established that communications between board members may be discoverable. *See Deakin*, 2021 U.S. Dist. LEXIS 196508, at *2 (ordering defendant to produce communications between board members).

Again, it is the Defendant's burden to establish the attorney-client privilege. *Kodish*, 235 F.R.D. at 452. Defendant has not shown why the entirety of Mr. Fleming's communication to the Chancellor and Board Chair is privileged. Plaintiff accordingly asks the Court to compel Defendant to produce the email listed in Entry 12 or, in the alternative, to provide the email to the Court for *in camera* inspection to determine what portion may be privileged and what portions can be released.

### Defendant's Position

Entry 12 of Defendant's privilege log contains legal advice given by Defendant's attorney and is therefore privileged.[4] For this reason, Plaintiffs' assertion that "[m]erely including Defendant's attorney on the email is insufficient to establish that the communication is privileged" is beside the point. *Cf. Musa-Muaremi*, 270 F.R.D. at 316 (distinguishing between legal advice and business advice).

Communications relaying attorney advise between non-lawyers can be protected by the attorney-client privilege. "The privilege issue is not settled by authorship or participation." *In re*

---

[4] Defendant has not asserted a privilege or protection over the attachment to the email that is Entry 12, which is the February 11, 2020, demand letter authored by Plaintiffs' counsel and threatening litigation.

*Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 433 (N.D. Ill.), *supplemented*, 432 F. Supp. 2d 794 (N.D. Ill. 2006). Rather, "[i]t is enough that the notes reveal, directly or indirectly, the substance of a confidential attorney-client communication." *Id.* (collecting cases); *see also Wells Fargo Bank, N.A. v. RLJ Lodging Tr.*, 13-cv-758, 2014 WL 3830545, at *2 (N.D. Ill. Aug. 4, 2014) (non-lawyer communicating legal advice to another non-lawyer "does not remove the legal advice . . . from the protection of the attorney-client privilege"); *Crabtree v. Experian Info. Sols., Inc.*, No. 1:16-CV-10706, 2017 WL 4740662, at *2 (N.D. Ill. Oct. 20, 2017) (non-lawyer employee communications were privileged where it was clear from the log that the communications were used to facilitate the provision of legal advice).

Entry 12's description in the privilege log makes clear that it relayed an attorney's legal advice to the recipient. That is protected by the attorney-client privilege. Additionally, discussion among Board members of how to react to Plaintiffs' threatened litigation would be protected as attorney work product, even if the discussion did not convey an attorney's advice (which it did). *See* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).").

**<u>Defendant's Privilege Log Entry 19</u>:**

<u>*Plaintiffs' Position*</u>

In Entry 19, Defendant claims attorney-client privilege and attorney work product protection over the recording of a February 13, 2020 closed session of the Daley College Board of Trustees meeting that was attended by Karla Gowen. During this session, the Board of Trustees discussed whether to terminate Plaintiffs' employment. That Defendant's in-house attorney was present for this meeting, "does not – in and of itself – suffice to establish that all communications during these meetings are protected by the attorney-client privilege." *Breuder v. Board of Trustees of Community College*

27

*District No. 502*, 2019 U.S. Dist. LEXIS 125300, at *9 (N.D. Ill. July 26, 2019); *see also Kodish*, 235 F.R.D. at 453 ("Although the Defendants' attorney was present at all times during the closed door meeting, his presence does not render all communications privileged.").

Personnel decisions are business decisions and Ms. Gowen's presence or participation does not change the business purpose of the meeting. In *Smith*, for example, the plaintiff brought a motion to compel a board of education to produce documents that were exchanged between an attorney who also held a position on the board and the other members of the board. *Smith*, 2019 U.S. Dist. LEXIS 102326. Despite the board's contention that those documents were subject to the attorney client and work product privileges, the court granted plaintiff's motion, reasoning that "decisions concerning the discipline and termination of employees are business decisions and any legal advice sought or received is incidental to considerations of what is most prudent for the successful operation of the business." *Id.*, at *5-6 (omitting citations). The documents reviewed in *Smith,* concerned "the process by which the plaintiff was placed on a performance improvement plan ("PIP") and ultimately terminated," which the court determined "[did] not fit within the definition of privileged legal advice." *Id.* at *6. Similarly, in *Kodish*, the court held that the Board of Trustees' discussions regarding plaintiff's work history, the reasons for moving to terminate him, and any "discussion of what is desirable from an employee" were all examples of discoverable information. *Kodish*, 235 F.R.D. at 453.

Here, the Board's decision to approve Plaintiffs' terminations is precisely the type of personnel decision that does not fall under the attorney-client or work product privilege. Notably, the purpose of this meeting was not to receive legal advice from the attorney present, but to review routinely prepared personnel reports and vote on personnel decisions. As the court in *Gibbons* recognized, motive and intent are central to any employment decision where an employee is claiming discrimination or retaliation. *Gibbons v. Vill of Sauk Village*, 2016 U.S. Dist. LEXIS 167931, at *11-12

(N.D. Ill. Dec. 6, 2016)  The court found that Gibbons thus had a "particularized need" for the closed-session materials, which reflected the Village's "motive and basis" for terminating her. As in *Gibbons*, Plaintiffs here are alleging the decision to terminate their employment was unlawfully motivated, placing Defendant's motives for terminating them directly at issue and demonstrating the same particularized need. *Id.* at *11.

Defendant has asserted the legitimacy of its employment decision as a defense in this matter. It cannot, therefore, shield Plaintiffs from fully exploring all facts and considerations that led to that decision. The Seventh Circuit has recognized that "the privilege is in derogation of the search for the truth and, therefore, must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000)(internal citation omitted). Plaintiffs here could not be terminated without Board approval. There is also no dispute that the Board discussed their terminations during the committee and closed session Board meeting. Plaintiffs must, thus, be permitted to fully explore all considerations discussed by the Board. Contrary to Defendant's contention that the Court has ruled Entry 19 is protected, the Court merely stated that if an *in camera* review determined that the closed portion of the meeting consisted of only legal advice, such legal advice would be protected. [*See* Ex. J at 7-8] As that has not been established, Plaintiffs respectfully request that this Court order Defendant to produce all notes and recordings of the meetings, including any closed sessions to Plaintiff (any portions of the session that do not include legal advice) and to the Court (any portions Defendant contends include legal advice). *See Smith,* 2019 U.S. Dist. LEXIS 102326; *Gibbons*, 2016 U.S. Dist. LEXIS 167931.

### Defendant's Position

This Court already ruled that Entry 19 is protected by the attorney-client privilege and Plaintiffs' attempt to relitigate this issue is improper. The Court ruled on Plaintiffs' last joint motion that Entry 19 is protected by the attorney-client privilege. And, the Court only suggested an *in camera* review if the document (in this case, an audio-visual recording) included other content related to

Plaintiffs, other than the Board members seeking and receiving legal advice. (*See* Pls.' Ex. J at 7:18–8:5 ("[If] what occurred in the closed session was essentially counsel for the board providing legal advice and discussing the fact that this lawsuit was a potential if the board ratified terminating these plaintiffs, then that's protected. If there's anything that occurred in the board meeting that falls outside of that, then I would see. You can send that to me in camera . . . . It would have to be relating to these plaintiffs, not anything else that was discussed.").) The Court should not entertain Plaintiffs' attempt to revisit the Court's prior ruling.

Moreover, Plaintiffs' factual assumptions regarding the content of the communication over which Defendant asserts privilege are incorrect. As the privilege log's description clearly shows, Defendant does not assert privilege over Entry 19 simply because its General Counsel was present at the closed session of the Board meeting. It does so because its lawyer provided legal advice to the Board regarding threatened litigation during that closed session. That is absolutely protected by the attorney-client privilege, as this Court previously recognized. (*See id.* at 7:18–8:5.)

Further, Plaintiffs mischaracterize the purpose of the closed session. The vast majority of the Board's three-and-a-half hour February 2020 meeting was public. A recording of it is still on YouTube. (*See* https://www.youtube.com/watch?v=3dNZvtvKFhE&list=PLiz59Eo-YzhJ9LajR9MzEbYrC0dGa1S90&index=6.) The minutes are also public. (*See* https://apps.ccc.edu/brpublic/2020/apr/33944.pdf.) The closed session—which lasted only 24 minutes—was held specifically so that the Board could receive legal advice from its General Counsel. Once the open session reconvened, the Chairman stated that "there was no action taken during this closed session." (*See* Recording at 3:29:30.) The Board then approved the Personnel Report in its entirety, which included recommending the terminations of Plaintiffs' employments, as part of the open session. (*Id.* at 3:31:30; *see* https://apps.ccc.edu/brpublic/2020/feb/33919.pdf.) Thus, the decision to terminate Plaintiffs' employments (along with the rest of the Board's business for that

month) was and is public. It is only the legal advice that was protected by the closed session then and should remain protected by the attorney-client and work-product privilege now.

None of the cases cited by Plaintiffs change this. In *Smith v. Board of Educ. of the City of Chicago*, the Court held that communications by an attorney who also held a HR position were not protected from disclosure because they contained "non-privileged business advice" concerning "the process by which plaintiff was placed on a performance improvement plan ('PIP') and ultimately terminated for what the Board considered to be unacceptable conduct." No. 17 C 7034, 2019 WL 2525890, at *1 (N.D. Ill. June 19, 2019). Here, General Counsel Gowen holds no HR position; she is Defendant's senior-most lawyer and was acting in this capacity during the closed session. Entry 19 contains her *legal* advice to the Board regarding Plaintiffs' counsel's recent, specific threat to file a lawsuit against the Board if it ratified the recommendation to terminate their employments. *Kodish v. Oakbrook Terrace Fire Protection Dist.* is similarly distinguishable because it involved non-lawyer Board members' discussions of HR-related topics like the plaintiff's "work history, [the] reasons for moving to terminate Plaintiff, and [a] discussion of what is desirable from an employee," not legal advice from the attorney in the room. 235 F.R.D. 447, 453 (N.D. Ill. 2006).

A better comparison is that the Court in *Smith* did hold that one of the communications was "covered by the attorney-client privilege and it need not be produced" because it "request[ed] a legal opinion and advice as what legal action that should be taken in response to plaintiff's actions." 2019 WL 2525890, at *2 n.2. That is what happened here. The Board initiated a closed session to seek legal advice from its lawyer, and the lawyer gave such legal advice.

Finally, Plaintiffs misrepresent the Court's opinion in *Gibbons v. Vill. of Sauk Vill.*, No. 15 CV 4950, 2016 WL 7104255, at *1 (N.D. Ill. Dec. 6, 2016). They cite portions of the Court's order discussing claims of privilege under the Illinois Open Meetings Act and the federal deliberative process privilege, neither of which is at issue here. Regarding the attorney-client privilege, the Court

found that portions of the recordings sought *were* protected from disclosure "because they convey the communication of legal advice." *Id.* at *4. This ruling as well is consistent with Defendant's claim of privilege here.

**Additional Non-ESI Discovery Issues That Remain Outstanding:**

*Plaintiffs' Position*

*History and Compliance with Local Rule 37.2*

Plaintiffs issued written discovery requests in May 2021, which Defendant answered in August 2021. Within weeks of receiving Defendant's answers and initial production, Plaintiffs notified Defendant of significant deficiencies in Defendant's answers and production, and the parties began engaging in extensive discussions, meetings, and written communications regarding the disputes over the sufficiency of the answers and production. These meetings were extensive, held in person and telephonically, and took place over the course of several months as the parties attempted to resolve and/or narrow those disputes.

The final meeting was held on February 24, 2022, at which time the parties began exchanging communications to memorialize the agreements, as Defendant's counsel had only agreed to certain compromises in principle, stating they needed to obtain approval for the compromises from their client. Having no confirmation regarding the numerous agreements in principle in February 2022, Plaintiffs brought a Motion for Referral to the Magistrate Judge for a Discovery Conference on April 6, 2022. [*See* Dkt. No. 43] In response to this motion, the Court ordered the parties to confer once again, and the parties met in person for yet another extensive meet and confer session on April 20, 2022, during which Defendant confirmed its agreement to many of the compromises reached in prior conferences.

The parties reached impasse, however, on certain issues and brought a Joint Motion to Resolve Discovery Disputes on May 12, 2022. [See Dkt. No. 50] The Court then entered an order on that

motion, compelling certain supplemental answers and production, on May 19, 2022. [See Dkt. No. 59] As such, Defendant was to provide supplemental answers and production, both pursuant to the Court's order and also pursuant to the parties' numerous agreements reached in February 2022 and later memorialized in April 2022. Defendant provided its Supplemental Answers to Interrogatories and Responses to Document Requests on May 31, 2022, which did not supplement many agreed upon items. Defendant did begin providing a rolling production of additional documents it had agreed to provide; however, as of July 2022, it was clear that Defendant had not yet fully supplemented its answers to interrogatories or provided a full supplemental production in connection with the agreements reached by the parties. As such, Plaintiffs requested a meet and confer pursuant to Local Rule 37.2, and the parties met on August 2, 2022 to further discuss the areas where Defendant's answers and production remained incomplete. The parties then continued to confer and exchange correspondence regarding these deficiencies.

On September 27, 2022, Defendant provided its Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production.[5] The Supplemental Responses, however, remained incomplete, and Plaintiffs accordingly sent correspondence to Defendant on October 13, 2022 to address the areas of continued deficiency. Defendant responded to this letter on November 22, 2022 and advised Plaintiffs (and this Court in a Joint Status Report filed the same day) that it "anticipates serving its Third Supplemental Responses to Plaintiffs' discovery requests in the next few business days." [*See* Dkt. No. 69, p.2; *See also* Exhibit I]

While the parties have continued to communicate about the status of the supplemental answers and production owed since that time, and Defendant has produced additional documents, Defendant never provided the promised Third Supplemental Responses to Plaintiffs' discovery

---

[5] On October 4, 2022, Defendant supplemented one additional interrogatory and one additional document request in a document titled "Defendant City Colleges of Chicago's Second Supplemental Responses to Plaintiffs' First Set of Interrogatories and Requests for Production."

requests. On January 16, 2023, Defendant's counsel confirmed that the supplemental answers and document production remain outstanding. [See D, 1/16/23 E-mail Exchange] Because the parties reached impasse on certain of the discovery issues, and because Plaintiffs are being prejudiced by the repeated delays with Defendant providing full supplemental answers and production, Plaintiff now brings this motion to compel to fully resolve the remaining issues pertaining to written discovery, which includes the need for a date certain for Defendant to complete production.

### *What Plaintiffs Seek to Compel*

Plaintiffs' counsel's most recent communications with Defendant's counsel reveal that Defendant has not finished producing its supplemental non-ESI materials, that it has not finished its third supplemental discovery responses. Defendant claims its third supplemental discovery responses will address its discovery deficiencies regarding Lynch Ints. Nos. 6-8; Saleh Int. No. 15, RFPs Nos. 66, 67, and 73; Lynch Ints. Nos. 21-24, Rubio Int. No. 17, Saleh Int. No. 16, and RFPs Nos. 74-78; RFPs 8 and 9; and RFPs Nos. 40, 64, and 65. [Ex. I, November 22, 2022 letter] Although Plaintiffs appreciate that Defendant has provided rolling production, Plaintiffs have waited nearly two months for these responses and can no longer rely on Defendant's claims that it will provide them "within the next few business days" or that the production will then be complete. [*See* Ex. I, p. 1] As such, Plaintiffs now require a means by which to obtain all outstanding non-ESI by a date certain and to ensure Defendant's production is complete and produced subject to a diligent search. Plaintiffs therefore request that the Court provide a date certain by which Defendant's supplemental production will be fully produced as well as an affidavit of completeness stating that Defendant has conducted a diligent search and produced all responsive documents. Plaintiff further requests that the Court compel Defendant to supplement specific discovery requests as agreed between the parties, or as ordered by this Court, and as set forth in more detail below.

*Defendant's Position*

There are seven City Colleges of Chicago. Each has its own human resources department, athletic department, Student Services or Student Development (depending on the college) department, and Title IX campus coordinator. Defendant also has a separate District Office that sits above the seven colleges. It has its own human resources department and Student Services department, in addition to the EEO, Labor & Employee Relations Office, Office of the Inspector General, Office of the Chancellor, Office of the General Counsel, and Office of the Board of Trustees. Plaintiffs have requested documents and information from all of these entities and all of these offices, among others. Unlike the ESI corpus, which Defendant's counsel obtained by having.pst files downloaded from CCC employees' work email accounts (which were stored on CCC servers), the non-ESI documents from these sources are not stored on a centralized system. Rather, multiple departments across the multi-campus district have had to perform manual searches on computers and equipment—as well as file cabinets and other places where physical papers are stored—to find documents responsive to Plaintiffs' numerous, broad, and complicated discovery requests. Plaintiffs know this.

Despite these practical difficulties, Defendant diligently conducted thorough searches in many different places, both physical and virtual, and made 20 rolling productions of non-ESI documents totaling over 6,000 pages. The below chart details Defendant's non-ESI production history:

| Bates numbers | Date of production |
|---|---|
| CCC_0000001 - CCC_0001276 | 8/16/2021 |
| CCC_0001277 - CCC-0001391 | 2/24/2022 |
| CCC_0001392 - CCC_0001427 | 4/26/2022 |
| CCC_0001428 - CCC_0001429 | 5/12/2022 |
| CCC_0001430 - CCC_0003278 | 5/26/2022 |
| CCC_0003279 - CCC_0003400 | 6/1/2022 |

| CCC_0003401 - CCC_0003415 | 6/3/2022 |
| CCC_0003416 - CCC_0003438 | 6/21/2022 |
| CCC_0003439 - CCC_0003512 | 8/19/2022 |
| CCC_0003513 - CCC_0003687 | 9/9/2022 |
| CCC_0003688 - CCC_0003768 | 9/15/2022 |
| CCC_0003769 - CCC_0004163 | 9/23/2022 |
| CCC_0004164 - CCC_0004175 | 9/27/2022 |
| CCC_0004175 - CCC_0004180 | 9/28/2022 |
| CCC_0004181 - CCC_0004188 | 10/4/2022 |
| CCC_0004189 - CCC_0004195 | 10/18/2022 |
| CCC_0004196 - CCC_0004222 | 10/20/2022 |
| CCC_0004223 - CCC_0004244 | 11/16/2022 |
| CCC_0004245 - CCC_0005517 | 12/29/2022 |
| CCC_0005518 - CCC_0006086 | 1/18/2023 |

In addition to its rolling productions, Defendant served supplemental discovery responses on September 27, 2022, that reflected its discovery and productions of documents. Defendant did so knowing that further supplements would probably be required as more documents turned up from its searches, but moved forward with serving them in the spirit of providing continuous updates as discovery progressed. By November 2022, Defendant believed that all of the documents it had looked for had been either found or confirmed to not exist. (*See* Pls.' Ex. I at 2) ("We are currently in the process of confirming that these documents with this information do not exist.") Defendant therefore told Plaintiffs in a letter that it had "almost completed its Third Supplemental Responses to [Plaintiffs' discovery] requests and should serve them within the next few business days." (*Id.*) The idea was for the third supplemental responses to be the final ones regarding non-ESI.

Defendant discovered some more documents when confirming its searches at the colleges had been accurately completed. Defendant informed Plaintiffs of this in mid-December and sent Plaintiffs an additional production in late December. (*See* Emails Regarding Disc. Resps., Def.'s **Ex. 10** at 1.) This cycle repeated in January. (*See id.* at 5.) On January 16, 2023, Defendant provided the following update to Plaintiffs:

> Our discovery and production of additional non-ESI documents has required us to hold off on finalizing and sending [Defendant's Third Supplemental Discovery Responses]. We are planning to produce this (hopefully) last batch of non-ESI docs this week and then send Defendant's third supplemental discovery responses next week. Then, later on next week, we expect the first rolling production from the ESI corpus to be ready for production to Plaintiffs.

(Pls.' Ex. D at 1.) True to its word, Defendant produced more non-ESI documents to Plaintiffs on January 18. (Email Regarding Non-ESI Produc., Def.'s **Ex. 11**.) But then, on January 20, Plaintiffs sent Defendant a 24-page draft motion to resolve discovery disputes, asking the Court to compel Defendant to do the exact thing Defendant had already said it would do two days earlier. (*See* Def.'s Ex. 1.) This required Defendant's counsel to divert their attention away from finalizing the discovery responses and instead respond to this motion. At no point did Plaintiffs attempt to meet and confer with Defendant by phone or in person to discuss any of this.

Plaintiffs' requests for "affidavit[s] of completeness" having to do with Defendant's fulfilment of its discovery obligations have no basis in law. The Federal Rules of Civil Procedure are self-executing in imposing obligations on parties and counsel related to discovery. *See* Fed. R. Civ. P. 26(g). Defendant and its counsel take those obligations seriously and have complied with them here.

**Lynch Interrogatories No. 6-8**

<u>*Plaintiffs' Position*</u>

Defendant agreed to provide contact information, dates of employment, job title(s), and salary information for all Deans and Associate/Assistant Deans of Student Services or Student Development at any CCC College since 2016. While Defendant provided certain pieces of this information in its supplemental answers, its answers remain deficient in that Defendant has not provided all the requested information for every individual, and in that the only contact information Defendant has provided for any individual is a work email address, including for those potential witnesses who no longer work for Defendant. Notably, Defendant has previously provided mailing addresses and phone numbers for other potential witnesses, demonstrating its awareness of what

constitutes appropriate contact information. Nevertheless, Defendant insists that the only contact information it needs to provide is a City College's email address to an email box it can both search and control per its "Policies and Guidelines Governing the Use of Computing and Technology Resources," which explicitly state that employees have "no guarantee of privacy in the use of computer and technology resources."[Ex. L, CCC_0000547] Plaintiffs accordingly seek personal phone numbers, personal email addresses, and mailing addresses for each listed individual so that these individuals may freely and honestly communicate with Plaintiffs' counsel without fear of being monitored.

Defendant also "agreed to provide the hiring and interviewing packages for hires after…2016 for those deans and associate deans of student services and student development." [Ex. J, Transcript at 18]. Defendant has yet to produce all of these documents for all 15 individuals it claims were hired into these roles after 2016. [*See* list below] That Defendant has produced hiring materials for some of the individuals listed below indicates that Defendant has hiring materials for every individual listed below that it has simply neglected to produce. Indeed, based on Plaintiffs' search of the documents Defendant has produced thus far, Plaintiffs have determined that Defendant's standard hiring materials include: a Personnel Action Form, an Authorization for Release of Information, a Personal Data Sheet, a SURS Pension Information Form, a Residency Statement, an Acknowledgement to Access Employee Manual and Policies, an Acknowledgement of Mandated Reporter Status, an Illinois State Education Loan Default Statement, Emergency Information, an Affidavit of Child Support Obligations, a Statement Concerning Your Employment in a Job Not Covered by Social Security, a Disclosure of Indebtedness, and a Salary Request Form. Plaintiffs are willing to accept only the Personnel Action Form and Salary Request Form for each individual listed below going forward as relating to the hiring packet; however, Plaintiffs further seek all outstanding application and interview materials, as Defendant has repeatedly agreed to produce. As Defendant has yet to

provide all contact information, dates of employment, and salary information and to produce hiring, application, and interview materials for all 15 individuals, Plaintiffs request that the Court compel Defendant to supply the following:

| Name | Missing Information and/or Documentation |
| --- | --- |
| Douglas Geiger | Dates of employment, contact information |
| Jameta Rogers | Interview materials, contact information |
| Michael Crawford | Hiring materials, application materials, interview materials, salary, contact information |
| Allison Rose | Hiring materials, application materials, interview materials, contact information |
| Lisa Willis | Hiring docs, contact information |
| Mario Diaz | Hiring materials, contact information |
| Brian Hall | Hiring materials, contact information |
| Patricia Cuevas | Hiring materials, dates of employment, contact information |
| Michelle Adams | Hiring materials, application materials, contact information |
| Inesha Kelly | Hiring materials, contact information |
| Chanel Bishop | Hiring materials, contact information |
| Jacquelyn Werner | Hiring materials, application materials, contact information |
| Luvia Moreno | Application materials, interview materials, contact information |
| Romell Murden-Woldu | Hiring materials, application materials, interview materials, contact information, dates of employment |
| Maria Llopiz | Hiring materials, application materials, interview materials, contact information, dates of employment |
| Linda Huertas | Hiring materials, application materials, interview materials, contact information, dates of employment |

Additionally, Plaintiffs have requested application and interview materials for every individual who was interviewed for the Dean or Associate/Assistant Dean roles but were not hired. In Defendant's November 22, 2022 letter to Plaintiffs, Defendant claimed it was still in the process of searching for the requested information and documents and that Defendant's third supplemental responses would reflect whether these documents exist. As Defendant has yet to provide these third supplemental responses, Plaintiffs ask the Court to compel Defendant to conclude a diligent search for these materials by a date certain and provide Plaintiffs with an affidavit of completeness that sets forth the steps Defendant took to search for these documents.

### Defendant's Position

Plaintiffs already have much of the information they now ask the Court to compel

Defendants to produce, in the form of recently produced documents. Had they been willing to wait another week before seeking to involve the Court, they would have received Defendant's supplemental discovery responses explicitly filling these gaps or stating that Defendant does not possess the requested information or documents.

*Contact Information*. Defendant provided contact information for the requested individuals (who are current employees) in the form of email addresses. (*See* Def.'s Supp. Disc. Resps. (Excerpted), Def.'s **Ex. 12** at 3–4.) This motion is the first time Plaintiffs have indicated that they want more contact information than that. Thus, Plaintiffs have not complied with Local Rule 37.2. Moreover, the email addresses *and* telephone numbers of current CCC employees are publicly available. *See* https://directory.ccc.edu/. If Plaintiffs truly believe Defendant is "monitor[ing]" their communications with its employees, despite having absolutely no basis for such a belief, they can simply ask the individual to communicate in person or via any other method once they have established contact.

*Hiring and interview packets*. Defendant produced to Plaintiffs hundreds of pages of these exact documents on December 29 and January 18. Job applications, resumes, and interviewer notes directly responsive to these discovery requests are already in Plaintiffs' possession. Defendant's supplemental discovery responses will make this even clearer to Plaintiffs. The Court need not compel Defendant to serve these responses; it already volunteered to do so by January 27—before the Court will even hear this motion.

<u>**Plaintiffs' Position**</u>

**Previously Ordered Performance Reviews for Certain Employees**

Plaintiffs further ask the Court to compel Defendant to comply with the Court's order during the May 19, 2022, hearing that Defendant produce performance reviews for all Deans and Associate/Assistant Deans hired after 2016 for each City College. [See J, Transcript at 21] With the

exception of a 2019-2020 performance evaluation for Mario Diaz and a 2007 performance evaluation for Lisa Willis, and performance evaluations for Tasha Williams, Defendant has not complied with the Court's order. Instead, Defendant has claimed that of the 15 people it listed as having been hired into the Dean or Associate/Assistant Dean roles since 2016, it has searched for performance reviews for only 4 individuals: Chanel Bishop, Brian Hall, Lisa Willis, and Jameta Rogers. [Ex. I, November letter].[6]

That Defendant has produced some performances evaluation reveals that Defendant maintains performance reviews for its Deans and Associate/Assistant Deans. Plaintiff therefore asks that the Court compel Defendant to comply with its order of May 19, 2022 and produce all performance reviews for each individual who was hired for the positions of Dean or Associate/Assistant Dean for any City College since 2016. Plaintiffs further request that this production be provided to Plaintiffs by a date certain and in conjunction with an affidavit of completeness.

### Defendant's Position

Plaintiffs are correct Defendant has produced only a few documents responsive to Plaintiffs' request for performance evaluations and reviews regarding Student Services and Student Development deans in the CCC system. The reason why is not a mystery to Plaintiffs. Defendant told them two months ago:

> Defendant produced additional performance reviews and supplemental responses in response to your August 25, 2022 letter, as well as a supplemental response to Saleh Interrogatory 15. Regarding the performance reviews of Chanel Bishop, Brian Hall, Zeleka Landrome-Brown, Lisa Willis, and Jameta Rogers, Defendant conducted a reasonable, diligent search *but has been unable to find responsive documents*, with one exception. A 2007 performance review of Lisa Willis in her prior role of Associate Dean of Instruction at Malcolm X College was produced to Plaintiffs on

---

[6] Defendant also claimed it searched for performance reviews for Zeleka Landome and Michael Brown, neither of whom Defendant listed in its supplemental answer to Lynch Interrogatory No. 6. Plaintiffs request that the Court compel Defendant to provide contact information, dates of employment, job title(s), and salary information for these individuals if they were hired into the Dean or Assistant/Associate Dean roles after 2016.

November 26, 2022. Defendant's supplemental responses to the document requests will reflect this.

(Pls.' Ex. I at 3 (emphasis added).) Why did Defendant limit its answer to those four individuals? Because those are the ones Plaintiffs specifically asked about in their October 12, 2022 letter that Defendant was responding to:

> In Defendant's 9/27 letter, you said you have been unable to find any performance reviews from Harold Washington College or Kennedy-King College. With that in mind, we are still missing performance reviews for the following individuals, who did not work at either of those campuses: *Chanel Bishop, Brian Hall, Zeleka Landrome-Brown, Lisa Willis, and Jameta Rogers*. These must be provided. If they don't exist, please state this.

(Pls.' Ex. H at 3 (emphasis added); *see also* Pls.' Ex. G at 3 ("[W]e have conducted diligent searches at Harold Washington College and Kennedy-King College and have not found any performance reviews.").)

Defendant has produced all documents responsive to this discovery request it could locate after a diligent search. And, it has told Plaintiffs this. It will tell them again in its forthcoming supplemental discovery responses. This Court's involvement is unnecessary.

### Lynch Interrogatories Nos. 21-24, Rubio Interrogatory No. 17, Saleh Interrogatory No. 16, and Requests for Production Nos. 74-78

#### *Plaintiffs' Position*

Defendant agreed to identify each individual who interviewed for each position at a City College to which Plaintiffs applied after their separations from Daley and to produce the interviewees' hiring packets, including application and interview materials. Although Defendant supplemented its answers to provide information regarding the individuals *hired* into the identified positions and, in some cases, to identify how many individuals Defendant interviewed for each position, Defendant's responses remain deficient. Defendant has yet to identify by name and contact information the individuals hired and to produce the hiring packets and application materials for each such person. Plaintiffs accordingly request that the Court order Defendant to supply the following:

42

| Discovery Request(s) | Position | Missing Information and/or Documentation |
|---|---|---|
| Lynch Int. 21 | Dean of Student Development at Daley College | Names of the six interviewees, application and interview materials for each interviewee |
| Lynch Int. 22/RFP 75 | Director of Chicago Roadmap at the District Office | Names of the three interviewees, application and interview materials for each interviewee |
| Lynch Int. 23/RFP 74 | Part Time Adult Educator at Malcolm X College | Defendant's production includes the names of several interviewees. However, it is impossible for Plaintiffs to know if all interviewees are included because Defendant has not provided a list of interviewees or stated how many people Defendant interviewed for this position. Plaintiffs request the names of all interviewees as well as all application and interview materials for each interviewee. |
| Lynch Int. 24/RFP 76 | Director of Civic Engagement | Defendant's supplemental answer to Lynch Interrogatory No. 24 states that "[i]ndividuals selected to interview for the position include Katharine McCormack. Katharine McCormack was offered and accepted the position. She remained in that position until December 2020. Thereafter, Elvis Guzman was selected to interview for the position." Plaintiffs request the names of the other interviewees as well as all application and interview materials for each interviewee. |
| Rubio Int. 17/RFP 77 | Director of Community Education Programs at Daley | Names of the five interviewees, application and interview materials for each interviewee |
| Saleh Int. 16/RFP 78 | Director of Predominantly Black Institutions Grant at MXC | Names of the interviewees, application and interview materials for each interviewee and for the hired individual |

Plaintiffs further request that this information and production be provided to Plaintiffs by a date certain and in conjunction with an affidavit of completeness.

### *Defendant's Position*

Again, Plaintiffs already have this information. Previously, Defendant was unable to find documents responsive to this request and told Plaintiffs as much. (*See* Pls.' Ex. I at 3.) When Defendant later discovered responsive documents, it immediately told Plaintiffs on January 7: "The non-ESI documents we plan to produce are related to Plaintiffs' requests for documents regarding individuals who were interviewed but not hired for positions related to Plaintiffs' failure-to-rehire claims." (Def.'s Ex. 2 at 3.) Defendant then produced the responsive documents to Plaintiffs on January 18. (*See* Def.'s Ex. 11.) Defendant will tell Plaintiffs again when it serves its third supplemental responses, before the Court hears this motion, and specify which positions Defendant has and does not have documents for.

**Deposition of Aneesa Saleh**

*Defendant's Position*

On August 24, 2022, Defendant noticed the deposition of Plaintiff Aneesa Saleh for September 8, 2022. (*See* Def.'s Ex. 7 at 2, 3, 4; Def.'s Ex. 8.) In the email enclosing the notice, Defendant's counsel stated that "we wish to move forward with the deposition of Ms. Saleh, without waiting for resolution of the ESI protocols" and that "we are happy to reschedule it for another date in early to mid-September that is convenient for you, Ms. Saleh, and us. Please provide us with a couple such dates." Plaintiffs did not to do so. Instead, they objected and refused to produce Ms. Saleh. (Def.'s Ex. 7 at 3.) In a subsequent email, Plaintiffs' counsel elaborated on this refusal:

> I did not refuse to produce Ms. Saleh altogether - I am objecting to the date you chose and for good reason. You have offered zero reason for why you wish to accelerate her deposition and conduct it prematurely at a time when Defendant should be continuing to gather and produce the written discovery answers and production owed to Plaintiff. For us to allow you to prematurely depose Ms. Saleh would not only prejudice our client by forcing her to sit for a deposition when we continue to gather information from Defendant (information in the sole possession of Defendant), but would also cause prejudice to Plaintiffs where it would divert attention from finalizing written discovery, which, frankly, must be the priority in this matter at this point.

(*Id.* at 2.)

Defendant had previously informed Plaintiffs its request to move forward with Ms. Saleh's deposition during a live telephonic meet and confer on August 2, 2022. Plaintiffs, however, continued to take the position that none of them would sit for a deposition until after Defendant had produced all of the written documents, including ESI, requested in written discovery.

Plaintiffs' objection to producing Ms. Saleh for a deposition has no legal merit. This Court's standing order concerning Discovery Motions and E-Discovery provides that "there is no 'order' or sequence in which discovery must take place; thus, one party's alleged failure or inability to respond to discovery will not excuse any other party's prompt compliance with discovery requests." https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==.

Accordingly, the assertions that written discovery has not yet concluded or that Defendant has not yet completed its full ESI production do not relieve Plaintiffs of their obligation under Rule 30 to produce Ms. Saleh for a properly noticed deposition. *See* Fed. R. Civ. P. 30(b).

Defendant therefore requests that the Court issue an order directing Plaintiff Saleh to attend and sit for her deposition by Defendant on a date to be noticed by Defendant. Defendant remains willing to work with Ms. Saleh's and Plaintiffs' counsel's schedules and agree upon a date reasonably close to the one specified in its to-be-filed notice.

### *Plaintiffs' Position*

Defendants request to compel the premature deposition of one of the plaintiffs is wholly unjustified and would cause all Plaintiffs prejudice. Defendant has not advanced a single reason why this Court should allow Defendant to divert its attention from completing its own discovery obligations to Plaintiffs, which admittedly remain outstanding and long overdue, and to instead focus its efforts on obtaining ***more*** discovery from Plaintiffs. The prejudice to Plaintiffs is palpable. Not only would Plaintiff Saleh have to sit for a deposition without full access to all of the information Defendant agrees is relevant and discoverable in this matter (and currently remains in the possession of Defendant and its counsel alone), but more importantly, the request of this Court to excuse Defendant from its timely completion of discovery obligations long overdue to Plaintiffs so that it can gain a tactical advantage in deposing the Plaintiff early would result in prejudice to Plaintiffs in requiring them to wait even longer to finally obtain full written discovery from Defendant. Such a request cannot be taken seriously, particularly where there is no reason for it. Defendant will have the opportunity to depose Ms. Saleh. She is a young woman who continues to reside and live in the Chicago areas; thus, there is no concern over her continued availability, for example. Respectfully, where Plaintiffs have long ago met their discovery obligations to Defendant, this request appears to be nothing more than an attempt to lure the Court into a shallow "both sides" canard as a means to

deflect from Defendant's own dilatory conduct and repeated delays in compliance with its discovery obligations in this matter. Plaintiffs respectfully request the Court reject such efforts and deny the requested relief, and to instead order Defendant to continue to focus its efforts on fully and finally producing the discovery that admittedly remains outstanding and owed to Plaintiffs.

/s/M. Megan O'Malley
M. Megan O'Malley
O'Malley & Madden, P.C.
542 So. Dearborn St. Suite 660
Chicago Illinois 60605
312.697.1382
Attorneys for Plaintiffs
momalley@ompc-law.com

/s/ Ian H. Fisher
Ian H. Fisher (ifisher@taftlaw.com)
Benjamin S. Morrell (bmorrell@taftlaw.com)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 527-4000