UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EILEEN LYNCH, ERIN RUBIO, and ANEESA SALEH, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 508 d/b/a CITY COLLEGES OF CHICAGO, <br><br> Defendant. | Case No. 2021-cv-00366 <br><br> Judge Sara L. Ellis <br><br> Magistrate Judge Sheila M. Finnegan |

**THIRD JOINT MOTION TO RESOLVE DISCOVERY DISPUTES**

Plaintiffs, through their counsel, and Defendant, through its counsel, and pursuant to Federal Rules of Civil Procedure 26, 34, and 37, jointly move this Honorable Court for an order resolving discovery disputes relating to Entry Nos. 94-98, 105, 107-110, 113-121, 123, and 183 of Defendant's Amended Privilege Log, and in support of which state the following.

**BACKGROUND RELEVANT TO THE DISCOVERY DISPUTE AND COMPLIANCE WITH LR 37.2**

**Plaintiffs' Position**

**Defendant Attempted to Conceal Highly Relevant Evidence and Continues to Withhold Personnel Communications under Claims of Privilege**

On January 31, 2023, this Court ordered Defendant to complete its production of all written discovery, including ESI, by March 31, 2023, and to provide an affidavit of completeness regarding the same. [*See* Docket No. 79, p. 10] Although Defendant filed a Notice of Compliance, asserting it had complied with the Court's order, Defendant qualified this assertion by confirming it had "produced all non-protected, non-privileged ESI that is responsive to Plaintiffs' discovery requests."

1

[*See* Docket No. 82, p. 3] Concerned, Plaintiffs' counsel contacted Defendant's counsel to request an updated privilege log and to ask that Defendant provide more information as to the unspecified other "protection" to which it referred. [Ex. A, April 4 Email] In response, Defendant stated it was still working on a log but that it had finished producing all ESI. [Ex. B, April 5 Email]

Two weeks later, within days of Plaintiff Saleh's scheduled deposition, Defendant produced another 2,000 pages of ESI. Among these pages – produced belatedly and more than 2 years into the litigation – were highly relevant emails that are, frankly, devastating to Defendant's core defense to this action, laying bare the blatant pretext in firing Plaintiffs. Specifically, Defendant claimed that Plaintiffs were terminated from their positions of Dean and Associate Deans of Student Services at Daley College as part of a restructuring of the department, from a Department of Student Services to a Department of Student Development. While this asserted restructuring, which coincidentally only affected the three whistleblowers, may not have passed the smell test at any rate, the e-mails Defendant withheld for years and only produced after the Court's deadline, hereinafter referred to as the "Labor Relations e-mails", reveal that City Colleges was aware all along that there was no basis to fire the Plaintiffs and that the restructuring was merely a third attempt for a justification to get rid of them on the heels of their whistleblowing.

The emails reveal that on the heels of Plaintiffs having reported the significant misconduct of Roberto Torres, the Dean of Instruction, to the Office of Inspector General ("OIG") in October 2019, President of Daley College, Janine Janosky, and Vice-President, Anne Panomitros, began immediately scheming for how to fire the whistleblowers for alleged performance based reasons, but they were admonished by several individuals within the District Labor Relations Office that they did not have justification for termination, and, importantly, that the lack of justification raised a concern about retaliation.

For example, after Dr. Janosky sent a document to the Deputy Chief Talent Officer, Eugene Nichols, seeking to terminate Plaintiff Eileen Lynch for performance-based reasons (on the heels of her whistleblowing), and listing purported justifications, the Executive Director of EEO and Labor & Employee Relations, Aaron Allen, firmly rejected the request to terminate and expressed concerns over retaliation, stating, *inter alia*:

> Eugene:
> I reviewed, but am concerned that the document is not substantial enough to support termination. In many instances,
>
> . . .
>
> strong. Even if everything that the VP says is true, the documentation strikes me as a little opinionated and one-sided in some places. EL could also possibly claim retaliation for being a "whistleblower" regarding the issue of backdating registrations if there is anything improper about the practice.

[Ex. C, CCC_0051138-39] Mr. Nichols echoed these same concerns, saying "I totally agree. The points you raise were also my concerns," and he then relayed the concerns to Dr. Janosky. [Ex. D, CCC_51177; Ex. E, CCC_51232-33] The Director of EEO, Labor & Employee Relations, Diandra Ritchie also weighed in via an email to Defendant's EEO Officer, Micki Yolich, stating:

> I agree with Aaron. As I was reading the documentation, I, too, thought it was insufficient and seemed very one-sided and personal. It reads as though Anne has a personal issue with Eileen. There was no

[Ex. F, CCC_51180-81]

Undeterred after being told they didn't have justification to fire Plaintiff Lynch, Dr. Janosky and Ms. Panomitros then decided to draft Performance Improvement Plans ("PIPs") for Plaintiff Lynch and another Plaintiff whistleblower, Erin Rubio. Yet, on account of the flimsy reasoning, they never issued these PIPs to Plaintiffs, and Plaintiffs were never even made aware of them during their employment. Instead, Dr. Janosky and Ms. Panomitros pivoted, within days, to a new plan to get rid of the whistleblowers – a plan that Roberto Torres himself came up with. Specifically, it was Torres's idea to restructure the Department of Student Services as a means to fire all three of the whistleblowers who reported his misconduct to the OIG. On November 10, 2019 – within weeks of Plaintiffs having

3

reported him to the OIG – Torres sent Dr. Janosky and Ms. Panomitros an email suggesting that they combine departments in a manner that would eliminate Plaintiff Lynch's position as Dean of Student Services, and in which email he specifically noted that "this plan does not include retention of the **current** Associate Deans of Student Services (ADSS)", *i.e.,* the other two whistleblowers, but noting "[w]e would need to hire a new ADSS – Student Activities as soon as possible." [Ex. G, CCC_0011038-42](emphasis added)[1]

Discovery in this lawsuit has, thus, revealed that Dr. Janosky and Anne Panomitros acted together to come up with any reason to fire the Plaintiffs in retaliation for, and on the heels of, them reporting misconduct in the workplace. Yet, Defendant withheld, for nearly 2 years, the Labor Relations emails that lay bare the brazen pretext that began with a request to fire Plaintiff Lynch under the guise of poor performance only to be told by Labor Relations that there were no grounds to do so, and that the suggested termination could appear retaliatory for her whistleblowing.

Despite the obvious relevance of these Labor Relations emails to Plaintiffs' claims of retaliation, Defendant chose not to produce these Labor Relations e-mails: 1) in Defendant's response to Plaintiffs' FOIA requests in 2020 (despite having produced several other emails); 2) in Defendant's non-ESI production in 20221 and 2022 (despite having produced several other emails as well as the attachments – but only the attachments – to the Labor Relations emails); or 3) in Defendant's rolling ESI productions, which Defendant falsely certified it completed by March 31.

When Plaintiffs' counsel asked Defendant why it belatedly produced these documents mere days before Ms. Saleh's scheduled deposition, Defendant explained that it "initially withheld them as privileged or protected from disclosure but later, upon further review, decided to withdraw the privilege or protection and produce them to Plaintiffs." [Ex. H, April 20 E-mail] It is, thus, clear from Defendant's own words that it knowingly withheld centrally relevant emails under a false claim

---

[1] Unlike the Labor Relations emails, this e-mail from Torres was produced prior to the Court's deadline.

of privilege that even Defendant has conceded it could not support. These emails, many of which have the subject line "Personnel Comsiderations" (sic)[2], were neither sent to, nor received by, Defendant's legal counsel or any personnel in its legal department. Had Defendant continued to assert a false claim of privilege over these plainly not privileged emails, Plaintiffs would have continued to have been deprived of the evidence that is very damning to Defendant's defense. As the Seventh Circuit has recognized, the attorney client privilege "is in derogation of the search for the truth and, therefore, must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000)(internal citation omitted).

Because of Defendant's admitted initial intent to conceal the evidence under a claim of privilege, Plaintiffs are very troubled by the new 235 entry privilege log produced by Defendant claiming privilege over communications discussing "personnel changes," a subject nearly identical to the "Personnel Considerations" subject line of the previously withheld Labor Relations emails.

**What Plaintiff Seeks to Compel, after Conferring Pursuant to Local Rule 37.2**

On April 20, three weeks after the Court-ordered deadline of March 31 to fully complete its written discovery obligations, Defendant finally produced its amended privilege log, comprising 235 new entries. [Ex. H, April 20 Email; Ex. I Amended Privilege Log] This log includes several entries reflecting communications that refer to "personnel changes." [Ex. I, Amended Privilege Log, p. 7-9, 12] Significantly, these emails, Entry Nos. 94-98, 105, 107-110, 113-121, 123, and 183, were all sent during the very same timeframe in which Plaintiffs were fired (January 2020), at a time when the Board was reviewing the request to fire them (February 11-13, 2020), when Roberto Torres was later fired (February 13, 2020), and when the Board reviewed his termination (March 12, 2020). Concerned that Defendant was, again, intending to conceal highly relevant evidence by improperly claiming privilege over documents discussing personnel changes rather than legal advice, Plaintiffs' counsel

---

[2] Plaintiffs will refer to the subject line by correcting the typo going forward - as "Personnel Considerations."

5

scheduled, and participated in, a meet and confer with defense counsel on April 26, 2023. Plaintiffs asked Defendant to produce the entries listed above that discuss "personnel changes," explaining that personnel decisions are not legal decisions and are, thus, not privileged.[3] Defendant refused to remove its assertions of privilege over these entries that discuss "personnel changes" and further claimed it had no obligation to identify who the "personnel changes" related to, whether the emails discussed Plaintiffs, or whether the legal counsel listed as recipients were truly recipients or whether they were merely copied on each email.

Based on Defendant's demonstrated history of withholding highly relevant communications that it admits it was intending to claim privilege over, and given that the law does not allow an employer to shield from production business decisions, such as personnel decisions, with a claim of privilege, Plaintiffs request that the Court compel Defendant to produce the identified entries.

**Defendant's Position:**

### ARGUMENT

**Plaintiff's Position:**

Defendant has not met its burden to establish the attorney-client privilege over Entries 94-98, 105, 107-110, 113-121, 123, or 183, all of which Defendant describes as being related to personnel changes. While the attorney-client privilege protects the "giving of professional advice" from an attorney to their client, it does not provide a blanket claim of privilege over all communications between attorney and client and does not protect communications regarding business decisions, such

---

[3] Plaintiffs also raised other concerns about the inadequacy of the log. By way of example, the log at times does not identify a sender or recipient, it often refers to discussions generically held regarding "FOIA request" or "EEOC Charge" without specifying if the discussion related to Plaintiffs or not, and certain entries do not reflect that an attorney or legal personnel was ever on the communication. Plaintiffs asked Defendant to amend the log with additional detail in order to allow for a meaningful analysis of the merits of the privilege claim. Although Defendant agreed to further amend the log, Plaintiffs have not yet received that amended log. Because Defendant confirmed in a further meeting held on May 17, 2023, that it would not produce the entries at issue in this motion, which Plaintiffs contend are not privileged, those entries are ripe for consideration by the Court.

6

as terminating employees. *Kodish v. Oak Brook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 452 (N.D. Ill. 2006); *see also Smith v. Bd. of Educ.*, 2019 U.S. Dist. LEXIS 102326, at *3 (N.D. Ill. June 19, 2019)("privilege is limited to situations in which the attorney is acting as a legal advisor," finding that decisions regarding termination of employees are business decisions). Furthermore, merely including legal counsel on an email is insufficient to establish a communication as privileged. *See Smith*, at *8 ("it cannot be said that the primary purpose of these e-mails was to secure legal advice" where the "e-mails in question were prepared by non-attorneys and sent to other non-attorneys…with a copy to [counsel]")[4]; *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 316 (N.D. Ill. 2010).

Although Defendant specifically asserts that it sought/received "legal advice" in myriad other entries on its privilege log, *see, e.g.,* Entries 52-54, there is absolutely no mention of legal advice in Entries 94-98, 109-110, 114, 123, or 183, which is required to support an assertion of attorney-client privilege. *Deakin v. Old Town Triangle Ass'n*, 2021 U.S. Dist. LEXIS 196508, at *2 (N.D. Ill. Feb. 12, 2021)(ordering defendant to produce documents whose privilege log descriptions did not suggest that legal advice was being shared or discussed). Moreover, even where Defendant does use the words "legal advice," *see* Entries 105, 107-108, 113-121, its descriptions make clear the alleged advice was regarding personnel decisions, which are, importantly, business decisions that are not privileged.

"Decisions concerning the discipline and termination of employees are business decisions and any legal advice sought or received is incidental to considerations of what is most prudent for the successful operation of the business." *Smith*, 2019 U.S. Dist. LEXIS 102326, at *5-6 (omitting citations). In *Kodish*, for example, the court held that discussions regarding plaintiff's work history, the reasons for moving to terminate him, and any "discussion of what is desirable from an employee" were all examples of discoverable information.235 F.R.D. at 453. Similarly, the documents reviewed in *Smith,* which concerned "the process by which the plaintiff was placed on a performance

---

[4] Here, Defendant refuses to even identify if counsel was the primary recipient or merely copied.

7

improvement plan ("PIP") and ultimately terminated…[did] not fit within the definition of privileged legal advice." 2019 U.S. Dist. LEXIS 102326, at *6.

Accordingly, where Defendant has shown itself willing to use claims of privilege to conceal and withhold highly relevant communications for years, as it did with the Labor Relations emails, and where the privilege log reveals that Defendant is continuing to withhold further communications regarding "personnel" decisions that are not privileged, Plaintiffs respectfully request that the Court compel Defendant to produce those emails found in Entries 94-98, 105, 107-110, 113-121, 123, and 183, as Defendant has failed to meet its burden of establishing attorney-client privilege.

Alternatively, should the Court require more information to assess the applicability – or lack thereof – of the privilege, Defendant should be required to produce the materials for *in camera* inspection. *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000). Upon *in camera* review, the Court will be best suited to determine what portion, if any, of the communications is privileged.

### Request for Ruling on Documents Subject to Prior Privilege Dispute

In the parties' Second Joint Motion to Resolve Discovery Disputes, filed on January 26, 2023, Plaintiffs asked the Court to compel Defendant to produce Entries 11, 12, and 19 of its initial privilege log, which consists of two emails and one audio recording of a meeting of Defendant's Board of Trustees. [Docket No. 73, p. 21] The Court ordered Defendant to submit those entries for an *in camera* review, [Docket No. 79, p. 21], which Defendant did on February 14, 2023. The Court has not yet ruled on these three entries. As the parties have already commenced oral discovery, and with Janine Janosky's deposition currently scheduled for June 12, 2022, Plaintiffs respectfully ask that the Court rule on Entries 11, 12, and 19 as soon as possible and in advance of June 12, 2023 in order to allow for a full review all relevant materials in advance of the upcoming depositions.

/s/M. Megan O'Malley  /s/
Attorneys for Plaintiffs  Attorneys for Defendant
M. Megan O'Malley  Ian H. Fisher (ifisher@taftlaw.com)
John P. Madden  Benjamin S. Morrell (bmorrell@taftlaw.com)

8

| | |
|---|---|
| Alexandra L. Raynor<br>O'Malley & Madden, P.C.<br>542 So. Dearborn St. Suite 660<br>Chicago Illinois 60605<br>312.697.1382<br>momalley@ompc-law.com | TAFT STETTINIUS & HOLLISTER LLP<br>111 East Wacker Drive, Suite 2600<br>Chicago, IL 60601<br>(312) 527-4000 |