# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EILEEN LYNCH, ERIN RUBIO, and ANEESA SALEH, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2021-cv-00366 |
| v. | ) ) | Judge Sara L. Ellis |
| BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 508 d/b/a CITY COLLEGES OF CHICAGO, | ) ) ) ) ) | Magistrate Judge Sheila M. Finnegan |
| Defendant. | ) ) | |

## THIRD JOINT MOTION TO RESOLVE DISCOVERY DISPUTES

Plaintiffs, through their counsel, and Defendant, through its counsel, and pursuant to Federal Rules of Civil Procedure 26, 34, and 37, jointly move this Honorable Court for an order resolving discovery disputes relating to Entry Nos. 95-98, 105, 107-110, 116, 123, and 183 of Defendant's Second Amended Privilege Log, and in support of which state the following.

### BACKGROUND RELEVANT TO THE DISCOVERY DISPUTE AND COMPLIANCE WITH LR 37.2

***Plaintiffs' Position: Defendant Attempted to Conceal Highly Relevant Evidence and Continues to Withhold Personnel Communications under Claims of Privilege***

On January 31, 2023, this Court ordered Defendant to complete its production of all written discovery, including ESI, by March 31, 2023, and to provide an affidavit of completeness regarding the same. [*See* Docket No. 79, p. 10] Although Defendant filed a Notice of Compliance, asserting it had complied with the Court's order, Defendant qualified this assertion by confirming it had "produced all non-protected, non-privileged ESI that is responsive to Plaintiffs' discovery requests." [*See* Docket No. 82, p. 3] Concerned, Plaintiffs' counsel contacted Defendant's counsel to request

1

127403529v2

an updated privilege log and to ask that Defendant provide more information as to the unspecified other "protection" to which it referred. [Ex. A, April 4 Email] In response, Defendant stated it was still working on a log but that it had finished producing all ESI. [Ex. B, April 5 Email]

Two weeks later, within days of Plaintiff Saleh's scheduled deposition, Defendant produced another 2,000 pages of ESI. Among these pages – produced belatedly and more than 2 years into the litigation – were highly relevant emails that are, frankly, devastating to Defendant's core defense to this action, laying bare the blatant pretext in firing Plaintiffs. Specifically, Defendant claimed that Plaintiffs were terminated from their positions of Dean and Associate Deans of Student Services at Daley College as part of a restructuring of the department, from a Department of Student Services to a Department of Student Development. While this asserted restructuring, which coincidentally only affected the three whistleblowers, may not have passed the smell test at any rate, the e-mails Defendant withheld for years and only produced after the Court's deadline, hereinafter referred to as the "Labor Relations e-mails", reveal that City Colleges was aware all along that there was no basis to fire the Plaintiffs and that the restructuring was merely a third attempt for a justification to get rid of them on the heels of their whistleblowing.

The emails reveal that on the heels of Plaintiffs having reported the significant misconduct of Roberto Torres, the Dean of Instruction, to the Office of Inspector General ("OIG") in October 2019, President of Daley College, Janine Janosky, and Vice-President, Anne Panomitros, began immediately scheming for how to fire the whistleblowers for alleged performance based reasons, but they were admonished by several individuals within the District Labor Relations Office that they did not have justification for termination, and, importantly, that the lack of justification raised a concern about retaliation.

For example, after Dr. Janosky sent a document to the Deputy Chief Talent Officer, Eugene Nichols, seeking to terminate Plaintiff Eileen Lynch for performance-based reasons (on the heels of

her whistleblowing), and listing purported justifications, the Executive Director of EEO and Labor & Employee Relations, Aaron Allen, firmly rejected the request to terminate and expressed concerns over retaliation, stating, *inter alia*:

. . .

strong. Even if everything that the VP says is true, the documentation strikes me as a little opinionated and one-sided in e some places. EL could also possibly claim retaliation for being a "whistleblower" regarding the issue of backdating registrations if there is anything improper about the practice. ),

CCC_51177; Ex. E, CCC_51232-33] The Director of EEO, Labor & Employee Relations, Diandra Ritchie also weighed in via an email to Defendant's EEO Officer, Micki Yolich, stating:

I agree with Aaron. As I was reading the documentation, I, too, thought it was insufficient and seemed very one-sided and personal. It reads as though Anne has a personal issue with Eileen. There was no

[Ex. F, CCC_51180-81 ]

Undeterred after being told they didn't have justification to fire Plaintiff Lynch, Dr. Janosky and Ms. Panomitros then decided to draft Performance Improvement Plans ("PIPs") for Plaintiff Lynch and another Plaintiff whistleblower, Erin Rubio. Yet, on account of the flimsy reasoning, they never issued these PIPs to Plaintiffs, and Plaintiffs were never even made aware of them during their employment. Instead, Dr. Janosky and Ms. Panomitros pivoted, within days, to a new plan to get rid of the whistleblowers – a plan that Roberto Torres himself came up with. Specifically, it was Torres's idea to restructure the Department of Student Services as a means to fire all three of the whistleblowers who reported his misconduct to the OIG. On November 10, 2019 – within weeks of Plaintiffs having reported him to the OIG – Torres sent Dr. Janosky and Ms. Panomitros an email suggesting that they combine departments in a manner that would eliminate Plaintiff Lynch's position as Dean of Student Services, and in which email he specifically noted that "this plan does not include retention of the **current** Associate Deans of Student Services (ADSS)", *i.e.,* the other two whistleblowers, but noting "[w]e would need to hire a new ADSS – Student Activities as soon

3

as possible." [Ex. G, CCC_0011038-42](emphasis added)[1]

Discovery in this lawsuit has, thus, revealed that Dr. Janosky and Anne Panomitros acted together to come up with any reason to fire the Plaintiffs in retaliation for, and on the heels of, them reporting misconduct in the workplace. Yet, Defendant withheld, for nearly 2 years, the Labor Relations emails that lay bare the brazen pretext that began with a request to fire Plaintiff Lynch under the guise of poor performance only to be told by Labor Relations that there were no grounds to do so, and that the suggested termination could appear retaliatory for her whistleblowing.

Despite the obvious relevance of these Labor Relations emails to Plaintiffs' claims of retaliation, Defendant chose not to produce these Labor Relations e-mails: 1) in Defendant's response to Plaintiffs' FOIA requests in 2020 (despite having produced several other emails); 2) in Defendant's non-ESI production in 20221 and 2022 (despite having produced several other emails as well as the attachments – but only the attachments – to the Labor Relations emails); or 3) in Defendant's rolling ESI productions, which Defendant falsely certified it completed by March 31.

When Plaintiffs' counsel asked Defendant why it belatedly produced these documents mere days before Ms. Saleh's scheduled deposition, Defendant explained that it "initially withheld them as privileged or protected from disclosure but later, upon further review, decided to withdraw the privilege or protection and produce them to Plaintiffs." [Ex. H, April 20 E-mail] It is, thus, clear from Defendant's own words that it knowingly withheld centrally relevant emails under a false claim of privilege that even Defendant has conceded it could not support. These emails, many of which have the subject line "Personnel Comsiderations" (sic)[2], were neither sent to, nor received by, Defendant's legal counsel or any personnel in its legal department. While Defendant points to one individual happening to have a law degree, it is undisputed he does not act as counsel, nor

---

[1] Unlike the Labor Relations emails, this e-mail from Torres was produced prior to the Court's deadline.
[2] Plaintiffs will refer to the subject line by correcting the typo going forward - as "Personnel Considerations."

4

does he work in the legal department. Had Defendant continued to assert a false claim of privilege over these plainly not privileged emails, Plaintiffs would have continued to have been deprived of the evidence that is very damning to Defendant's defense. As the Seventh Circuit has recognized, the attorney client privilege "is in derogation of the search for the truth and, therefore, must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000)(internal citation omitted).

Because of Defendant's admitted initial intent to conceal the evidence under a claim of privilege, Plaintiffs are very troubled by the new 235200+ entry privilege log produced by Defendant claiming privilege over communications discussing "personnel changes," a subject nearly identical to the "Personnel Considerations" subject line of the previously withheld Labor Relations emails.

While Defendant quibbles about Plaintiffs having pointed to 235 entries on the new log when it was really only 204 new entries (due to continuous numbering from a prior log), what matters is that Defendant produced this extensive new log 3 weeks after it was ordered to complete written discovery [Ex. H, April 20 Email; Ex. I Amended Privilege Log], along with 2,000 new pages of discovery, including the Labor Relations emails. Defendant claims these emails were on its "draft privilege log" – a log never sent to Plaintiffs – before it belatedly decided to produce the emails. Of course, therein lies the problem – Defendant again concedes it was very much going to try to hide damning evidence in this case behind a false claim of privilege.

***Defendant's Position***

Plaintiffs' Background section belongs in a closing argument; a discussion of the merits of this case has no place in a discovery motion—especially one that is supposed to be five pages long, inclusive of both sides' positions. Defendant City Colleges of Chicago ("CCC") disputes Plaintiffs' characterizations of the evidence and their arguments as to the merits, but will not add length by detailing them here.

CCC notes that its original ESI Privilege Log produced on April 20, 2023, contained 204 entries, not 235. Numbers 1–22 were skipped to account for the 22 entries in CCC's non-ESI Privilege Log produced to Plaintiffs on September 28, 2022, (*see* D.E. 73-11), and numbers 57–65 were skipped because CCC decided after further review to withdraw its claims of privilege over those documents and produce them to Plaintiffs. CCC's Amended ESI Privilege Log produced to Plaintiffs on May 19, 2023, contains 202 entries, because CCC deleted two entries after deciding to withdraw its claims of privilege over those documents and produce them to Plaintiffs in unredacted form based on discussion in an April 26, 2023, Rule 37.2 meet-and-confer with Plaintiffs. CCC produced five other documents in redacted form after the same discussion and, thus, amended those entries to describe only the redacted portions. Although CCC believes the descriptions in its prior privilege log were adequate, it also provided additional details about many of the entries to address concerns raised by Plaintiffs in the meet-and-confer.

CCC further notes that it is not withholding the "Personnel Comsideration" documents discussed above by Plaintiffs. Those documents were on its draft privilege log when it produced its ESI documents on March 31, 2023, but CCC ultimately decided to withdraw its assertions of privilege and produce them, notwithstanding the fact that CCC employee Aaron Allen in the Labor Relations Office is a licensed Illinois attorney and arguably was giving advice about the potential for a legal claim. Thus, these documents are not the subject of this motion.

6

**Plaintiffs' Position~~:~~ What ~~Plaintiff Seeks~~ _Plaintiffs Seek_ to Compel, after Conferring Pursuant to ~~Local~~ Rule 37.2**

~~On April 20, three weeks after the Court-ordered deadline of March 31 to fully complete its written discovery obligations, Defendant finally produced its amended privilege log, comprising 235 new entries. [Ex. H, April 20 Email; Ex. I~~_Defendant's belated_ Amended Privilege Log~~] This~~ log included several entries reflecting communications that referred to "personnel changes" but that did not identify to whom these "personnel changes" related to. [Ex. I~~, Amended Privilege Log~~, p. 7-9, 12] The emails in these entries, Entry Nos. 94-98, 105, 107-110, 113-121, 123, and 183, were all sent during the very same timeframe in which Plaintiffs were fired (January 2020), at a time when the Board was reviewing the request to fire them (February 11-13, 2020), when Roberto Torres was later fired (February 13, 2020), and when the Board reviewed his termination (March 12, 2020). Concerned that Defendant was, again, intending to conceal highly relevant evidence by improperly claiming privilege over documents discussing personnel changes rather than legal advice, Plaintiffs' counsel scheduled, and participated in, a meet and confer with defense counsel on April 26, 2023. Plaintiffs asked Defendant to produce the entries listed above that discuss "personnel changes," explaining that personnel decisions are not legal decisions and are, thus, not privileged.[3] Defendant refused to remove its assertions of privilege over these entries that discuss "personnel changes" and further claimed it had no obligation to identify who the "personnel"

---

[3] Plaintiffs also raised other concerns about the inadequacy of the log. By way of example, the log at times did not identify a sender or recipient, it often referred to discussions generically held regarding "FOIA request" or "EEOC Charge" without specifying if the discussion related to Plaintiffs or not, and certain entries did not reflect that an attorney or legal personnel was ever on the communication. Plaintiffs asked Defendant to amend the log with additional detail in order to allow for a meaningful analysis of the merits of the privilege claim. Defendant agreed to further amend the log on April 26, but did not provide its second amended log until nearly a month later, on May 19. Plaintiffs have not yet had a meaningful opportunity to review the full 235 entries on the updated log to determine if the deficiencies were corrected, and reserve the ability to do so and raise any further issues upon review; however, as Defendant has not withdrawn the claim of privilege over the entries discussed herein, that Plaintiffs contend are not privileged, the parties have reached impasse as to those entries and they are ripe for consideration by the Court.

changes" related to, whether the emails discussed Plaintiffs, or whether the legal counsel listed as recipients were truly recipients or whether they were merely copied on each email. After receiving the draft of this joint motion, however, Defendant produced a second amended privilege log on May 19, 2023, in which it did provide additional information about each entry related to "personnel changes." [Ex. J, Second ~~Amended Privilege~~Am. Priv. Log] Based on the additional information, Plaintiffs agreed to withdraw their motion as to nine entries, Entries 94, 113-115, 117-121. However, as the amendments made to Entry Nos. 95-98, 105, 107-110, 116, 123, and 183 confirmed that the personnel changes discussed therein did relate to Plaintiffs primarily, and to Roberto Torres, Plaintiffs informed Defendant that they maintained their position that these entries were not privileged.

Because of Defendant's demonstrated history of withholding highly relevant communications that it admits it was intending to claim privilege over, and given that the law does not allow an employer to shield from production business decisions, such as personnel decisions, with a claim of privilege, Plaintiffs request that the Court compel Defendant to produce Entries 95-98, 105, 107-110, 116, 123, and 183.

Defendant's position that Plaintiffs did not meet their obligations under Rule 37.2 is demonstrably false. The very day Defendant served its log, Plaintiffs identified it was deficient and asked for a meet and confer. [Ex. H] A meet and confer was held on April 26, during which Plaintiff requested Defendant produce the entries discussing personnel issues, explaining those were business decisions to which the privilege did not attach. Plaintiff's position was reiterated the next day, in writing, citing legal authority. [Ex. K, April 27 Letter] Defendant confirmed in a second meet and confer on May 17 that it would not produce the personnel entries and agreed the parties had reached impasse as to those entries. [Ex. 6] This motion does not seek resolution for the remaining entries Defendant later amended and Defendant's attempt to confuse the Court by

8

conflating the entries on which the parties reached impasse with entries that may remain in dispute is improper.

It is surprising that Defendant complains of the 6 full days it took to provide Plaintiffs with its portion of this motion, admitting to repeatedly refusing to cooperate. Plaintiffs only took 2 days to get Defendant the draft motion (served May 19 after the parties reached impasse May 17). May 25 was the last day Plaintiffs could file this motion and have it heard prior to July (and prior to the decisionmaker's deposition set for June 12) because the Court isn't hearing motions in June and Defendant's counsel is unavailable June 1. Defendant's cooperation in preparing a joint motion was needed, but withheld. Nevertheless, Plaintiff waited to get Defendant's portion just hours before the joint motion needed to be filed, leaving Plaintiffs almost no time for review and reply.

**Defendant's Position:**

Again, CCC declines to respond to Plaintiffs' arguments regarding the evidence and the merits of this case other than to note its disagreement with those characterizations. Plaintiffs have failed to comply with Local Rule 37.2 and the Court's standing order, as the meet-and-confer process on the issue they seek a ruling on has not concluded. The parties have engaged to discuss Plaintiffs' dispute regarding certain entries in CCC's ESI Privilege Log. After listening to Plaintiffs' concerns and re-reviewing its privilege log and the underlying entries, CCC produced additional documents (some redacted, some unredacted), amended many entries in its privilege log, and shared the amended log with Plaintiffs. CCC was transparent during this process that this is what it was doing. In fact, during the parties meet-and-confer phone call on May 17, defense counsel suggested holding a follow-up meet-and-confer call after CCC produced its amended privilege log to discuss which issues would remain in dispute and which would be resolved. Plaintiffs declined.

While this process was still unfolding, Plaintiffs sent a draft joint discovery motion to CCC on Friday, May 19, 2023, at 4:16 PM and told CCC to "[p]lease have your positions to us no later

than Tuesday, May 23 at 12 p.m. noon." (**Ex. 1**.) The draft motion was nearly twice the five-page limit allowed by the Court's standing order, even without any of CCC's positions inserted. (*See* **Ex. 2**.) CCC sent its Amended ESI Privilege Log to Plaintiffs later that afternoon. (**Ex. 3**.)

As expected, the Amended ESI Privilege Log mooted parts of the dispute regarding privilege log entries. The following Monday, Plaintiffs' counsel emailed defense counsel stating :"Based on your changes, we will agree to withdraw our motion as to Entries 94, 113-115, and 117-121. We intend to send you updated language for the background portion of our motion to account for this change."(**Ex. 4**.) The email also stated that "we will continue to move on Entries 95-98, 105, 107-110, 116, 123, and 183 as we do not believe these are privileged, even with your amendments. Since there are no significant changes to the motion, we still expect to receive your portion by noon tomorrow so that we can get this before the court as soon as possible." (*Id.*) Two hours later, defense counsel received a revised draft joint motion from Plaintiffs' counsel. (**Ex. 5**.)

Defense counsel told Plaintiffs' counsel they needed more time than 21 hours to draft responses to Plaintiffs' arguments in the nine-page joint motion and stated CCC would send its responses on Thursday, May 25. (**Ex. 6**.) Plaintiffs' counsel's multiple responses speak volumes. (**Ex. 7**; **Ex. 8**.) Among other things, Plaintiffs' counsel refused to extend the "deadline" she previously set and threatened to "file the motion as a Plaintiff's motion and note that we gave you the opportunity to participate." (Ex. 7.) The next day, counsel stated: "If you have your portion to us by 6:30 p.m. today, we can still file it as joint. If you refuse, we will proceed with a Plaintiff's filing only." (Ex. 8.) These unilateral demands plainly violate the Court's reminder in its standing order on discovery disputes "that compliance with Local Rule 37.2 requires a **good faith effort** to resolve discovery disputes." (emphasis in original.)

10

Defense counsel responded later that day, discussing several open issues, including Plaintiffs' discovery dispute. Counsel attempted to confer regarding one privilege log entry (Entry 116) that Plaintiffs maintained was still in dispute:

> While defendant continues to claim privilege over this email, we accidentally omitted in the description column of the amended log that the email concerned a media inquiry "regarding elimination of VP of Institutional Effectiveness position at Daley College" (omitted words underlined). Indeed, this type of issue is the very reason we suggested on May 17 that an additional meet and confer should occur to the extent our May 19 amended privilege did not resolve the open disputes. That aside, we represent to you that Entry 116 relates to the elimination of the VP of Institutional Education; if you prefer, we can provide a corrected log with that revision. Please let us know if this offer will remove Entry 116 from your proposed joint discovery motion.

(**Ex. 9**.) To date, CCC has not received a response from Plaintiffs. Nor has it received copies of the proposed exhibits Plaintiffs intend to file with this motion.

Now, Plaintiffs readily admit that they "have not yet had a meaningful opportunity to review the full 235 [sic] entries on the updated log to determine if the deficiencies were corrected, and reserve the ability to do so and raise any further issues upon review." Thus, the meet-and-confer process is still ongoing and this motion is unripe.

## ARGUMENT

### *Plaintiff's Position:*

Defendant has not met its burden to establish the attorney-client privilege over Entries 95-98, 105, 107-110, 116, 123, or 183, all of which Defendant describes as being related to personnel changes. While the attorney-client privilege protects the "giving of professional advice" from an attorney to their client, it does not provide a blanket claim of privilege over all communications between attorney and client and does not protect communications regarding business decisions, such as terminating employees. *Kodish v. Oak Brook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 452 (N.D. Ill. 2006); *see also Smith v. Bd. of Educ.*, 2019 U.S. Dist. LEXIS 102326, at

11

*3 (N.D. Ill. June 19, 2019)("privilege is limited to situations in which the attorney is acting as a legal advisor," finding that decisions regarding termination of employees are business decisions). Furthermore, merely including legal counsel on an email is insufficient to establish a communication as privileged. *See Smith*, at *8 ("it cannot be said that the primary purpose of these e-mails was to secure legal advice" where the "e-mails in question were prepared by non-attorneys and sent to other non-attorneys…with a copy to [counsel]")[4]; *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 316 (N.D. Ill. 2010).

Although Defendant specifically asserts that it sought/received "legal advice" in myriad other entries on its privilege log, *see, e.g.,* Entries 52-54, there is absolutely no mention of legal advice in Entries 95-98, 109-110, 123, or 183, which is required to support an assertion of attorney-client privilege. *Deakin v. Old Town Triangle Ass'n*, 2021 U.S. Dist. LEXIS 196508, at *2 (N.D. Ill. Feb. 12, 2021)(ordering defendant to produce documents whose privilege log descriptions did not suggest that legal advice was being shared or discussed). Moreover, even where Defendant does use the words "legal advice," *see* Entries 105, 107-108, 116, its descriptions make clear the alleged advice was regarding personnel decisions, which are, importantly, business decisions that are not privileged.

"Decisions concerning the discipline and termination of employees are business decisions and any legal advice sought or received is incidental to considerations of what is most prudent for the successful operation of the business." *Smith*, 2019 U.S. Dist. LEXIS 102326, at *5-6 (omitting citations). In *Kodish*, for example, the court held that discussions regarding plaintiff's work history, the reasons for moving to terminate him, and any "discussion of what is desirable from an employee" were all examples of discoverable information.235 F.R.D. at 453. Similarly, the

---

[4] Here, Defendant refuses to even identify if counsel was the primary recipient or merely copied.

documents reviewed in *Smith,* which concerned "the process by which the plaintiff was placed on a performance improvement plan ("PIP") and ultimately terminated…[did] not fit within the definition of privileged legal advice." 2019 U.S. Dist. LEXIS 102326, at *6.

Accordingly, where Defendant has shown itself willing to use claims of privilege to conceal and withhold highly relevant communications for years, as it did with the Labor Relations emails, and where the privilege log reveals that Defendant is continuing to withhold further communications regarding "personnel" decisions that are not privileged, Plaintiffs respectfully request that the Court compel Defendant to produce those emails found in Entries 95-98, 105, 107-110, 116, 123, and 183, as Defendant has failed to meet its burden of establishing attorney-client privilege.

Defendant does not dispute that the entries at issue involve personnel decisions and does not dispute that the vast majority of the communications were not drafted by attorneys or that the entries do not reflect that legal advice was being given or sought. Rather, Defendant often relies on claims of work product privilege as a means to shield the communications from production. A careful review, however, reveals that the work product doctrine would not apply. For example, Entry Nos. 95 and 96, both drafted by non-lawyers and relating to the "restructuring of Student Services Department" were drafted prior to when Plaintiffs obtained counsel or asserted any legal claims. As such, there was no anticipation of litigation at the time. Defendant has claimed, as its core defense, that the restructuring was a non-retaliatory, legitimate business decision. Thus, no work product attaches to a claimed legitimate business decision. Similarly, Entry Nos. 109 and 110 relate to the personnel decision made to fire Roberto Torres; yet, he has never asserted or filed claims. There is no work product to protect.

Because Defendant, as discussed above, did not provide Plaintiffs with more than a few hours to review its portion and include any arguments in reply, Plaintiffs are unable to reply to the

specific arguments made as to the entries individually, and would respectfully request that the Court hear argument on each at hearing, but nevertheless maintain that all of the entries discuss personnel changes and, for reasons discussed above, are not privileged. Defendant's authority is not persuasive as it largely relies on non-employment cases. Moreover, its reliance on an out-of-context quote from the *Wilstein* court does not warrant support for its position where the *Wilstein* court continued from Defendant's purported position by stating, "[w]hen the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected [merely] because legal consideration are also involved'." *Wilstein v. San Tropai Condo. Master Ass'n*, 189 F.R.D. 371, 379 (N.D. Ill. 1999). Thus, *Wilstein* supports Plaintiffs' position.

Alternatively, should the Court require more information to assess the applicability – or lack thereof – of the privilege, Defendant should be required to produce the materials for *in camera* inspection. *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000). Upon *in camera* review, the Court will be best suited to determine what portion, if any, of the communications is privileged.

### Defendant's Position

Plaintiffs challenge CCC's assertions of attorney-client privilege, attorney work-product protection, or both, over Entries 95–98, 105, 107–110, 116, 123, and 183 of its Amended ESI Privilege Log. Despite having never seen these documents, Plaintiffs nevertheless confidently assert that they are not in fact privileged because they contain lawyers' business advice, not legal advice—directly contradicting CCC's descriptions of the documents authored by individuals who *have* seen them. Attorneys "have their own professional responsibilities and duties to properly invoke the privilege, with a basis in fact and law, and not always be second-guessed by the courts [or opposing counsel] when a proper and detailed privilege log has been produced." *Billy Goat IP LLC v. Billy Goat Chip Co. LLC*, No. 17-CV-9154, 2019 WL 10250940, at *4 (N.D. Ill. Feb. 1,

14

2019). CCC produced a proper, detailed privilege log that fully complies with Rule 26(b)(5). Plaintiffs' arguments have no basis in fact or law.

Entries 95, 96, 109, and 110 are communications from CCC employees sending documents to CCC attorneys and requesting attorney review of them. Plaintiffs cite no authority to support their apparent position that a privilege log entry is *per se* insufficient under Rule 26(b)(5) simply because it does not contain the phrase "legal advice." The descriptions for both entries make clear that the employees sent documents to the attorneys for their review, comment, and legal advice in anticipation of litigation. Relatedly, documents sent to counsel as "part of a confidential information gathering process, with the client selecting and sending documents to its counsel to assist counsel in understanding and responding to inquiries from the state or the SEC or investors, . . . [a]re confidential and privileged communications." *U.S. Sec. & Exch. Comm'n v. Hollnagel*, 07 CV 4538, 2010 WL 11586980, at *10 n.13 (N.D. Ill. Jan. 22, 2010). So, too, here.

Entries 97 and 98 concern a CCC attorney's request for information and a CCC employee's response providing attorney-requested information. Documents like these that "reflect requests for information from attorneys to the client for the purpose of providing legal advice" are protected by the attorney-client privilege. *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 244 F.R.D. 434, 441 (N.D. Ill. 2007). Additionally, "the documents were prepared upon the request of the attorneys in preparation for litigation, as evidenced by the electronic communications, and thus meet the elements of the [work-product] doctrine." *Id.* As Plaintiffs repeatedly point out, CCC employee Aaron Allen had already raised the possibility of litigation arising from the termination of Plaintiffs' employments. Thus, these documents were created in anticipation of litigation. *See also Charvat v. Valente*, 12 CV 5746, 2015 WL 4037776, at *3 (N.D. Ill. July 1, 2015) (holding work-product doctrine protects from disclosure documents prepared "in response to . . . counsel's request for information").

Entry 105 is a communication authored by CCC's General Counsel providing legal advice to its Board of Trustees. Plaintiffs have absolutely no basis for challenging this assertion of attorney-client privilege.

Entries 107 and 108 are communications relaying legal advice from CCC's General Counsel to the members of the Board of Trustees. A "privileged communication does not lose its status as such when an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation. Management personnel should be able to discuss the legal advice rendered to them as agents of the corporation." *Wilstein v. San Tropai Condo. Master Ass'n*, 189 F.R.D. 371, 379 (N.D. Ill. 1999) (citation omitted). Similarly, "conversations among the board members discussing their attorney's legal advice about potential litigation risk and legal strategy are privileged under the attorney-client privilege." *Id.* at 379–80. That is exactly what happened here. These entries thus fall well within the privilege and are protected from disclosure.

Plaintiffs never responded to CCC's May 23, 2023, email clarifying the description of Entry 116. (*See* Ex. 9.) Thus, it is unclear whether Plaintiffs continue to challenge CCC's claim of privilege over this document. If they do, it is protected by the attorney-client privilege because it is an attorney-authored document providing legal advice to CCC employees. The privilege log makes this abundantly clear.

Entries 123 and 183, like Entry 98 discussed above, are documents sent to CCC's attorneys by a CCC employee and prepared "in response to . . . counsel's request for information" in anticipation of litigation. *Charvat*, 2015 WL 4037776, at *3. They are thus protected by the attorney work-product doctrine. Beyond that, Entry 123 establishes that it also contains legal advice authored by CCC's attorney, making it protected by the attorney-client privilege as well. That both entries contain the phrase "personnel changes" does not transform an attorney's legal advice into business advice, nor does it vitiate the work-product protection. Plaintiffs' motion to compel

16

should be denied.

## **Request for Ruling on Documents Subject to Prior Privilege Dispute**

***Plaintiffs' Position***

In the parties' Second Joint Motion to Resolve Discovery Disputes, filed on January 26, 2023, Plaintiffs asked the Court to compel Defendant to produce Entries 11, 12, and 19 of its initial privilege log, which consists of two emails and one audio recording of a meeting of Defendant's Board of Trustees. [Docket No. 73, p. 21] The Court ordered Defendant to submit those entries for an *in camera* review, [Docket No. 79, p. 21], which Defendant did on February 14, 2023. The Court has not yet ruled on these three entries. As the parties have already commenced oral discovery, and with decisionmaker Janine Janosky's deposition currently scheduled for June 12, 2022, Plaintiffs respectfully ask that the Court rule on Entries 11, 12, and 19 as soon as possible and in advance of June 12, 2023 in order to allow for a full review all relevant materials in advance of the upcoming depositions.

***Defendant's Position***

CCC takes no position on this request by Plaintiffs.

Respectfully submitted,

| | |
|---|---|
| /s/M. Megan O'Malley | /s/ |
| Attorneys for Plaintiffs | Attorneys for Defendant |
| M. Megan O'Malley | Ian H. Fisher (ifisher@taftlaw.com) |
| John P. Madden | Benjamin S. Morrell (bmorrell@taftlaw.com) |
| Alexandra L. Raynor | TAFT STETTINIUS & HOLLISTER LLP |
| O'Malley & Madden, P.C. | 111 East Wacker Drive, Suite 2600 |
| 542 So. Dearborn St. Suite 660 | Chicago, IL 60601 |
| Chicago Illinois 60605 | (312) 527-4000 |
| 312.697.1382 | |
| momalley@ompc-law.com | |

17

18

Document comparison by Workshare Compare on Friday, May 26, 2023 9:15:57 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\bmorrell\Desktop\IHF\motion to compel\Third Joint Motion to Resolve Discovery Disputes with CCC's positions 5-25-23.docx |
| Description | Third Joint Motion to Resolve Discovery Disputes with CCC's positions 5-25-23 |
| Document 2 ID | file://C:\Users\bmorrell\Desktop\IHF\motion to compel\Lynch v. CCC - Third Joint Motion to Resolve Discovery Disputes - FINAL.docx |
| Description | Lynch v. CCC - Third Joint Motion to Resolve Discovery Disputes - FINAL |
| Rendering set | TaftStandard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 7 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |

| Format changes | 0 |
|---|---|
| Total changes | 23 |